ESTATE OF PHILIP A. CARROLL, DECEASED, NINA R. CARROLL AND PHILIP CARROLL, EXECUTORS, AND NINA R. CARROLL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82322. Filed September 17, 1962.

*Charles C. Parlin, Esq.*, and *Margaret Smith, Esq.*, for the petitioners.

*Leon M. Kerry, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income taxes for the calendar years 1953 and 1954, in the amounts of $12,352.94 and $4,168.02, respectively.

The sole issue for decision is whether certain expenditures made by the decedent, Philip A. Carroll, for repairing, rehabilitating, and redecorating a chapel located on his ancestral estate in Maryland, which for a period of more than 240 years has been used exclusively by the Roman Catholic Church as a "public oratory" that functions as the parish church of the community, are deductible for income tax purposes as charitable contributions to said church, under section 23(o)(2) of the 1939 Code and section 170(c) of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation of facts and all exhibits attached thereto, are incorporated herein by reference.

The petitioners herein are the executors of the estate of Philip A. Carroll, deceased, who died a resident of the State of New York in the year 1957; and said decedent's widow, Nina R. Carroll. Philip and Nina filed a joint income tax return for each of the calendar years here involved, with the district director of the internal revenue for the Lower Manhattan District of New York City.

Philip (hereinafter called the decedent) was, at the time of his death, a lawyer and a member of a law firm in New York City. During the taxable years involved and for some time prior thereto, he owned a large country estate in Howard County, Maryland, which is known as Doughoregan Manor. This estate on which he and his family resided during a portion of each year had been owned by various members of the Carroll family since the colonial era. It originally was acquired by Charles Carroll, "the Settler," sometime between his arrival in Maryland in 1688, and the time of the transfer of the capital of Maryland to Annapolis in 1694. Since then, it has been held in the Carroll family in the direct male line, for seven generations. Among its past owners were Charles Carroll of Carrollton, a signer of the Declaration of Independence; and John Lee Carroll of Doughoregan Manor, a governor of Maryland.

Located next to the manor house on the estate's spacious grounds is a structure known as St. Mary's Chapel (hereinafter referred to as the chapel). This was built and furnished by the first Charles Carroll in about the year 1720, as a place of Roman Catholic worship where the Carrolls, their employees, their tenants, and other people of the neighborhood might seek refuge and practice their religious beliefs. Originally, the chapel was erected as a separate structure, physically unconnected with the manor house. Sometime later, however, a wing of the manor house was so extended as to join the two

buildings; but even after this change, the chapel continued to be a separate unit, and there has at no time been any doorway or other passageway between it and the manor house.

For many years including the taxable years here involved, this chapel had been made available to the Roman Catholic Archdiocese of Baltimore, without rent or other compensation, for use exclusively as a parish church for the community. It was designed and completely furnished as a place for Roman Catholic worship; and at the front thereof was a marble altar which was consecrated by a Roman Catholic bishop as a "permanent altar." The chapel qualifies under the Canon Law of that church as a "public oratory," which means that it is a place for worship by members of the public, generally. It is classified by the church as a "mission" of the parish of St. Louis in Clarksville, Maryland, which is about 7 miles distant. It is not, and never has been, a "private chapel." The doors are never locked; and the public has unrestricted access thereto at all times.

On all Sundays and Holy Days, masses are solemnized in this chapel—usually by a priest serving the Parish of St. Louis under the assignment and direction of the Archdiocese of Baltimore, and at other times by a visiting priest or bishop of that faith. The chapel is used also for baptisms, marriages, and funerals for the members of the parish; and also for special services during Lent. The membership of the parish during the years involved numbered approximately 150—of whom only about 25 were employees on the Doughoregan estate. The average attendance at Sunday masses was from 75 to 100 persons. All expenses for heating, electricity, janitor services, and other costs of operation, were paid by the Carrolls; and the archdiocese provided only the priest's services, and certain religious objects used for the purposes of worship.

During the taxable years involved, the decedent was, as before stated, the owner of Doughoregan estate; and as such, he held title to the land on which the chapel stood, and also owned the chapel building and its furnishings. Local property taxes on this property were paid by him. No conveyance, transfer, or lease of any legal interest therein was ever executed or delivered to the Roman Catholic Church, either by the decedent or any of his ancestors. The decedent had the legal right and power, if he had chosen to exercise the same, to close the chapel at any time, or to terminate its further use for church purposes. But the likelihood of any such termination was extremely remote. Up to the time of the decedent's death, neither he nor any of his predecessors had ever had any intention of terminating the church's long-continued use of the chapel; and at the time of the trial herein, it was still being used exclusively as a Roman Catholic parish church.

In 1953, the chapel and its furnishings gave evidence of general deterioration. The marble altar therein began to collapse, because of damage by termites and rot in the supporting wooden beams beneath it—thus making it necessary to dismantle the altar and repair its supporting structure. In this situation, the chapel could not with safety be used for religious services; and accordingly, the solemnization of masses and other services was temporarily moved to the chapel's sacristy, until such time as the necessary repairing and rehabilitation could be effected.

The decedent assumed all the costs of such rehabilitation; and his wife Nina took over the responsibility of planning and arranging for the work to be done. This repairing, rehabilitating, and redecorating was accomplished during the years 1953 and 1954. At all times since, the chapel has continued to be used as theretofore, exclusively as a Roman Catholic parish church.

During the year 1953, the decedent made expenditures for such rehabilitation work in the amount of $12,470.46; and in the following year 1954, he made additional expenditures for such purpose in the amount of $2,832.53. None of these expenditures, nor any other expenses in connection with the work, were paid by the Roman Catholic Church or by any other person. A summary description of the nature of the items for which such expenditures were made, and the amounts thereof (all as stipulated by the parties), is as follows:

*1953 Payments*

The Miller Art Glass Studio:
For repairing art stained glass windows_____ $111.39

Monumental Storage and Carpet Cleaning Company:
Removal of chapel equipment to storehouse; fire insurance; warehouse handling and storage from April 10 through December 10, 1953 _____ 87.69

Security Storage Company Incorporated:
Storage and insurance of rugs and draperies behind altar_____ 243.46

Thomas Hicks & Sons, Inc.:
Removing and resetting marble altar; replacing wood timbers and flooring of chancel; placing concrete slab over vault and building masonry foundation for altar; scaffolding chapel for plasterers and painters; repairing plaster of chapel; testing and replacing some of the heating pipes under the chancel floor; installing oil burner in chapel; and painting interior of chapel_____ 6,375.00

Sterling Lighting Co.:
Furnishing electric lighting fixtures complete with Mazda lamps for 4 brass candle chandeliers in chapel, and one brass candle chandelier in sacristy_____ 985.00

Joseph H. Argabright & Son (Electrical Contractors):
Labor and material to rewire chapel and sacristy; installing additional electrical fixtures in chapel; wiring for oil burner in chapel and making necessary connections with electrical outlets in main house_____ 1,120.74

Elisabeth Draper, Inc.:
   Consultation on decoration of St. Mary's Chapel_____     $224. 31
The Demuth Corporation:
   Cleaning and polishing pews, wood wainscoting and organ; labor
      in removing old carpet and draperies; supplying crimson velvet;
      and supplying and laying carpet in chapel_____     3, 322. 87

                                                  $12, 470. 46

*1954 Payments*

Monumental Storage and Carpet Cleaning Company:
   Storage of chapel equipment from Dec. 10, 1953 through March 17,
      1954, and redelivery thereof to St. Mary's Chapel_____     $28. 76
The Demuth Corporation:
   Installing 22 kneelers for chapel and fastening them to original
      wood kneelers; remaking and hanging 3 new reredos wall hang-
      ings; supplying new overhead tracks; supplying red silk velvet;
      taking down, repleating all the tops and rehanging; making and
      hanging balcony curtains; supplying materials for prie-dieus
      and confessional; making and hanging confessional curtains;
      making 43 cushions for prie-dieus; making one organ seat
      cushion _____     1, 392. 49
Security Storage Co.:
   Storage and hauling rugs and draperies_____     60. 87
The Miller Art Glass Studio:
   Repairing two art leaded glass windows and replacing new pieces
      of painted stencil glass, labor and materials_____     17. 50
Thomas Hicks & Sons, Inc.:
   Making and carving new cross for tombstone_____    $159. 80
   Tightening Baptismal Font_____    19. 70
   Replacing statues to chapel and rebolting to building____    43. 41
   Repairing exterior cornice on chapel including pedi-
      ment on front; removing bees from loft_____    1, 010. 00    1, 332. 91

                                                  $2, 832. 53

The decedent and his wife, in their joint income tax returns for the years 1953 and 1954, claimed deductions for the above-mentioned expenditures as charitable contributions to the Roman Catholic Church for rehabilitation of St. Mary's Chapel.[1] The respondent, however, in his notice of deficiency herein, disallowed these claimed deductions, on the ground that they did not constitute allowable contributions under section 23 (o) of the 1939 Code, and section 170 (c) of the 1954 Code.

---

[1] As regards the year 1954, both in the joint income tax return and in the petition filed herein, the amount claimed as such charitable contribution was $5,472.14. However, in the parties' stipulation of facts received at the trial, the amount of such claimed contribution for 1954 was reduced to $2,832.53, due to exclusion for the claim of the cost of rehabilitating the priest's room which was located in the adjoining manor house.

OPINION.

This is an unusual case, in that here the claimed charitable contributions consist of expenditures made by the decedent for repairing and refurbishing an ancient chapel, known as St. Mary's Chapel, which was located on an ancestral estate owned by said decedent, and which during the taxable years involved and for more than 240 years prior thereto, has been used exclusively by the Roman Catholic Church as a "public oratory" that functioned as the parish church for the surrounding community. So far as could be determined by the witnesses, including the priest of said parish, this is probably the only instance, at least in America, where a parish church of the Roman Catholic faith has functioned continuously on privately owned property. The reason for this dates from colonial history, when due to the then persecution of the Roman Catholics in Maryland, the authorities of that church granted special dispensation for the establishment of chapels on certain private estates, where members of that faith might seek refuge and practice their religious beliefs.

The respondent's objection to the allowance of the claimed charitable deductions for the expenses of repairing and refurbishing the chapel, is that title to the land on which the chapel stands and also ownership of the chapel building and its furnishings, was in the decedent. Based on such premise, respondent contends that any repairing and refurbishing done with respect to the chapel redounded to the benefit of the decedent's realty, and hence could not qualify as a contribution to the Roman Catholic Church.

In our view however, this position is too narrow; and the question here presented should not, and cannot, be resolved solely on the basis of who owned the title to the chapel property. Both section 23(o) of the 1939 Code and section 170(c) of the 1954 Code (which are here controlling), in providing for the allowance of charitable contributions, make no specific reference to the title or ownership of the premises on which the charitable activities are conducted; but rather, place their emphasis on the character of the charitable donee and on the nature of the activities for which the contribution is made. Thus, each of these statutory sections (so far as here material) allows deductions in the case of an individual for contributions or gifts "to or for the use of" a qualified charitable organization for religious or charitable public purposes.

Congress made provision for deduction of such charitable contributions in order to induce and encourage the making of such gifts. See S. Rept. No. 1567, 75th Cong., 3d Sess. (reprinted in 1939–1 C. B. (Part 2) 779, 789). And this Court has held that "Tax provisions as to charities are begotten from motives of public policy and are

not to be narrowly construed." *Estate of J. B. Whitehead*, 3 T.C. 40, 48, affd. 147 F. 2d 977; *Helvering* v. *Bliss*, 293 U.S. 144. Thus the Internal Revenue Service has recognized that where expenditures made by an individual were clearly for "the use" and the benefit of a qualified public charity, deductions therefor are allowable, even though there was no passage of title or ownership of specific property. For example, it is provided in Income Tax Regulations, section 1.170–2(a)(2), that: The cost of a privately owned uniform without general utility which is required to be worn in performing donated services, is deductible; that similarly, out-of-pocket transportation expenses necessarily incurred in rendering services donated to a charity are deductible; and that reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of rendering services donated to a charity are deductible. See also to the same effect Rev. Rul. 55–4, 1955–1 C.B. 291, followed by this Court in *Henry Cartan*, 30 T.C. 308, 321–322; Rev. Rul. 56–508, 1956–2 C.B. 126; and Rev. Rul. 58–279, 1958–1 C.B. 145.

We here conclude, in applying said statutory provisions, that the determinative question here before us is essentially one of fact, i.e.: Whether the particular expenses for which the charitable deductions are here claimed, were actually intended by the decedent to be, and were, incurred by him exclusively "for the use of" the Roman Catholic Church in enabling St. Mary's Chapel to function as a parish church of that faith for the benefit of the surrounding community. It is our opinion that this question must be answered in the affirmative. There can be no doubt that during the period of more than 240 years since the chapel was first built in the year 1720, it has been operated *exclusively* as a "public oratory" and "mission" of the Roman Catholic Church; and that it served throughout said period and during the taxable years involved, as a parish church for the surrounding community, where persons of that faith might worship, and where masses, Lenten services, marriages, baptisms, and funerals were solemnized. Thus, St. Mary's Chapel functions in the same manner as the usual parish church not located on private property.

The expenditures here involved were all incidental to repairing, redecorating, refurbishing, and rehabilitating this chapel. Such expenditures had become necessary for the reason that, because of the general deterioration of the ancient chapel over the years, such repairs and rehabilitation were essential if the chapel's long-established use as a place of worship was to be continued. Witness Philip Carroll, who is the son of the decedent and one of the executors of his estate, testified that the nature of the work for which the expenditures were made was: "just repairs, nothing was added. The damage that occurred was repaired and the general premises renovated." Likewise the parish priest testified with respect to the

repair of the altar, which was one of the principal items of expenditure:

There was a wooden platform to the altar, on which the altar was erected, and the wooden platform failed and the altar was coming apart and it had to be taken apart and the platform rebuilt, * * *

\* \* \* \* \* \* \*

If the Carroll family did not do it, and we deemed it necessary, the Church would do it. * * *

Based on our examination of all the evidence, we here find as a fact and hold that the expenditures involved (all of which have been listed and are summarily described in the stipulated schedule incorporated in our Findings of Fact), actually were intended to be made, and were made, for the exclusive use of the Roman Catholic Church, so as to enable St. Mary's Chapel to continue to function, as it had for more than 240 years previously, as a public parish church of that faith. The work done (which included repairing, cleaning, replacement of worn furnishings, replacement of wornout parts of the altar supports, and of the heating and electrical wiring system, redecorating, and the incidental cartage and storage of equipment while the repairing was in process) was all for the purpose of making it possible for the chapel to continue to function, to increasing the comfort and safety of those members of the public who worshiped there, and to enhancing the beauty and dignity of the religious setting for the masses and other services performed there. This rehabilitation work was not intended to be, and was not, for the decedent's own benefit. Nor was it intended to, nor did it, increase the value of the decedent's estate.

We decide the issue in favor of the petitioners.

*Decision will be entered under Rule 50.*