MORRIS N. SCHARF and FRANCES S. SCHARF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scharf v. Commissioner
Docket No. 2351-72.
United States Tax Court
T.C. Memo 1973-265; 1973 Tax Ct. Memo LEXIS 22; 32 T.C.M. (CCH) 1247; T.C.M. (RIA) 73265; December 4, 1973, Filed. Harold Kamens and Rexford L. Lyon, for the petitioners. John P. Reis, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency 1968
$ 804.76
1969
3,406.21
*23 2 The issues for decision are: (1)Whether fire insurance proceeds received in 1968 are includable in petitioners' income as long-term capital gain or whether they constituted a nontaxable return of capital; (2) whether petitioners are entitled to a charitable contribution deduction for a building donated to a volunteer fire department for use in fire drills or, alternatively, whether petitioners are entitled to an abandonment or demolition loss as a result of its use by the fire department; and (3) whether petitioners are entitled to deduct a loss for a building demolished by a lessee prior to the effective date of the lease. FINDINGS OF FACT Some facts have been stipulated by the parties and are found accordingly. Morris N. Scharf and Frances S. Scharf (herein called petitioners) are husband and wife whose legal residence was in Ramsey, New Jersey, when they filed their petition in this proceeding. They filed their joint Federal income tax returns for 1968 and 1969 with the district director of internal revenue at Newark, New Jersey. Morris N. Scharf (herein called petitioner) is an attorney and a real estate broker. He has also served as a municipal magistrate for *24 approximately 30 years. 3 Margolin Property In 1949 the petitioner purchased some property (herein referred to as the Margolin property) at a cost of $15,000. He allocated the purchase price for Federal income tax depreciation purposes as follows: $13,500 to the building and $1,500 to the land. From 1949 until 1967, the building was leased successively to various tenants for whom the petitioner made alterations and repairs. Other repairs and improvements to the building were made and paid for by the tenants. At no time between 1949 and 1967 did the petitioner increase his reported basis in the Margolin building to reflect the cost of any capital improvements he may have expended. Since all records with respect to any capital expenditures were destroyed in the cellar storage room of petitioner's office building when it was flooded in August 1970, petitioner estimated that he expended at least $7,500 of his own funds for capital improvements for lessees of the Margolin building between 1949 and 1967. Petitioner claimed depreciation of $12,000 on the Margolin building over this 18-year period, using a cost basis of $13,500. Respondent reallocated the purchase price of *25 $15,000 for the Margolin property as follows: a cost basis in the building of $12,000 and a cost basis in the land of $3,000. The effect of such reallocation is that the Margolin building would be fully 4 depreciated for Federal income tax purposes by the end of 1967, leaving a basis of zero against which any future deductions or return of capital for the building may thereafter be applied. On October 29, 1967, a fire partially destroyed the Margolin building. As a result of this fire, petitioner received in 1968 insurance proceeds totaling $5,914.05, which respondent determined to be taxable as a long-term capital gain. Petitioner did not report this amount as gain in 1968, treating it instead as a return of capital. The Margolin building was so badly damaged by the fire in 1967 that it could not be rented without substantial renovation. By early 1968 the building was about to be condemned because of its unsafe condition. In addition, steadily rising land values in that area had made the land far more valuable than the damaged building, and the petitioner decided it would not be economically feasible to restore the existing building. With the encouragement of municipal *26 authorities, the petitioner arranged for the Mahwah Volunteer Fire Department to use the building to conduct fire drills and test the use of its new fire equipment. During three ensuing fire drills conducted by the fire department with petitioner's consent, the Margolin building was completely burned down. After the fire there was debris around the building which petitioner covered and filled in. He also had 5 the rest of the foundation and the chimney pushed over to avoid injury to persons nearby. On their 1968 Federal income tax return the petitioners claimed a deduction for a charitable contribution of $13,131.65 for the value of the fire-damaged building donated to the volunteer fire department. Respondent disallowed the claimed charitable deduction in its entirety. By an amendment to their petition filed February 15, 1973, the petitioners alleged that the value of their charitable contribution is $28,500 rather than the $13,131.65 originally claimed on their Federal income tax return for 1968, and that they are entitled to an increased charitable contribution carryover to 1969 and subsequent years. The Margolin building was given by the petitioner to the fire department *27 partly for the purpose of having it burned down. The transfer was not evidenced by any deed or other formal conveyance. Donations of buildings for use in fire drills provide a rural fire department with opportunities to determine its "firematic" skills under controlled conditions. Funds are not available to purchase buildings for this purpose. The fair market value of the Margolin building at the time it was given to the fire department was $12,835.95. 6 Conrad Property Petitioners owned other property (herein referred to as the Conrad property) which they leased to the Conrad Development Corporation on September 23, 1969, for a term of 95 years beginning January 1, 1970. Under the terms of the lease Conrad was to pay petitioners a rental four times greater than the rental paid by the prior lessees. Petitioner Morris Scharf was aware that existing structures on the Conrad property would not produce this higher rental, and, as a real estate broker, he knew Conrad would have to build other structures to sustain its financial commitments under the lease. The lease gave Conrad the right to demolish any buildings on the property at Conrad's expense. In seeking to lease *28 the property, it was Conrad's intention to demolish the existing buildings so that it could construct a new office building thereon. Shortly after the execution of the lease but prior to its effective date, Conrad demolished a 50-year old building on the property. The remaining useful life of the building was less than 95 years. On their 1969 Federal income tax return the petitioners claimed a demolition loss deduction of $12,020, which was disallowed by the respondent. 7 OPINION 1. Insurance Proceeds Recovered on Damaged Building. Whether the fire insurance recovery of $5,914.05 should be included in petitioner's income in 1968 as long-term capital gain depends upon what his basis in the Margolin building was when he received the insurance proceeds. Petitioner claims that his basis in the building was at least equal to, if not greater than, the $5,914.05 he received, and that the proceeds were therefore a return of capital. He testified that he had expended at least $7,500 for capital improvements to the Margolin building. However, this amount was never added to his reported cost basis in the Margolin building prior to 1968. The amount of these claimed improvements *29 obviously exceeds the insurance proceeds received, and, if substantiated, would alter the character of the insurance proceeds from taxable gain to nontaxable return of capital. Petitioner also testified that the actual purchase price of the Margolin property exceeded his reported basis of $15,000. The amount of excess purchase price the petitioner claims is $6,000, and, if proved, would alter the character of the insurance proceeds received to that of a nontaxable return of capital rather than a long-term capital gain. 8 Respondent, on the other hand, argues that the petitioner's basis in the Margolin building was totally depreciated by the end of 1967, and therefore the insurance proceeds were taxable to petitioner as a long-term capital gain. Respondent has reallocated the originally claimed purchase price of $15,000 for the Margolin property to reflect a cost basis to petitioner of only $12,000 in the building thereon, and would not allow any claimed adjustment to this basis for the cost of capital improvements by petitioner between 1949 and 1967 due to lack of substantiation. At trial, petitioner introduced evidence of the original purchase price of the Margolin building, *30 including two mortgages, a deed, a bond, a closing statement and his 1967 Federal income tax return. Taken as a whole, we think these documents are conflicting and fail to support petitioner's attempt to establish a purchase price in excess of $15,000. The asserted purchase price of $21,000 conflicts with the amount shown as the purchase price in the closing agreement signed by the petitioner and the Margolins. It also conflicts with the amount shown by petitioners on their joint Federal income tax returns. And it is inconsistent with the purchase price reflected in a letter dated May 29, 1970, which the petitioner sent to the Internal Revenue Service. Hence, we conclude that the original cost of the Margolin property to petitioner was $15,000. 9 It is well settled that respondent may reallocate depreciation deduction allowances by adjusting the basis of property between depreciable and nondepreciable assets if the facts warrant it. Caxton Printers, Ltd., 27 B.T.A. 1110 (1933). Such a reallocation by respondent is presumably correct, and the burden of proving it incorrect falls upon the petitioner. Potter Farms, Inc., 6 B.T.A. 110 (1927). Here *31 the respondent has reallocated petitioner's reported basis in the Margolin building downward from $13,500 to $12,000, and correspondingly claims that the building was fully depreciated by the end of 1967. Petitioner has offered no evidence to show that this reallocation is erroneous. Estate of E. P. Lamberth, 31 T.C. 302 (1958); Lightsey v. Commissioner, 63 F.2d 254 (C.A. 4, 1933), affirming a Memorandum Opinion of this Court. The mere fact that the petitioner's claimed depreciation deductions in prior years were not questioned by respondent is not controlling since the petitioner must prove the reasonableness of his claimed deduction for the years in issue. Big Four Oil & Gas Co. v. Commissioner, 83 F.2d 891 (C.A. 3, 1936), affirming 28 B.T.A. 61 (1933); Wright Contracting Co., 36 T.C. 620 (1961), affd. 316 F.2d 249 (C.A. 5, 1963). Petitioner's opinion, without showing facts to establish the reasonableness of his claimed allocation of a cost basis of $13,500 10 to the building, is not sufficient to overturn respondent's reallocation. H.E. Harman Coal Corporation, 16 T.C. 787, 803 (1951), *32 affirmed on this issue 200 F.2d 415 (C.A. 4, 1952). Petitioner also claims that his basis in the Margolin building should be increased to reflect the cost of capital improvements totaling at least $7,500 which he asserts he expended between 1949 and 1967 for various tenants of the building. Petitioner is clearly entitled to increase his basis in the Margolin building by the amounts he expended for capital improvements to the property. Section 1.1016-2(a), Income Tax Regs.; W. B. Mayes, Jr., 21 T.C. 286, 290 (1953). However, the petitioner has presented no documentary evidence to sustain his claim that capital improvements were made by him in the amount indicated. He testified that all records of such expenditures were destroyed by a flood of his storage room in August 1970. He further testified that various alterations to the Margolin building were made and paid for by tenants. Petitioner offered no evidence to show the nature of any capital improvements, their cost, or their useful life. Furthermore, if expenditures were for repairs and alterations, which were for maintaining the building for rental purposes, it is possible the petitioner may have *33 already deducted such costs as business expenses in prior years. Petitioner must bear the burden of failing to be more explicit in his proof. 11 Estate of E. P. Lamberth, supra. The evidence submitted by him for an increased basis resulting from unspecified capital improvements is vague and insufficient to carry his burden of proof. At best his estimate is based on incomplete records and uncertain memory over many years. In these circumstances we are simply unwilling to find that his basis in the Margolin building should be increased to reflect an unsubstantiated figure of $7,500. Lightsey v. Commissioner, supra at 255. Accordingly, we hold that the amount ($5,914.05) of the insurance proceeds received in 1968 for the fire damage to the Margolin building is includable in the petitioners' income as a long-term capital gain in that year. 2. Donation of Damaged Building to Fire Department. Petitioner seeks to deduct the fair market value of the Margolin building which he donated to the Mahwah Volunteer Fire Department for use in its fire drills. In 1968 the building was at least 40 years old, and had been partially destroyed by a fire in 1967 *34 before its use by the fire department. The condition of the building after the fire was such that it could not be rented without renovation, and it was about to be condemned by municipal authorities for its unsafe condition. Since the land had risen in value to the point where it was far more valuable than the building, the petitioner decided not 12 to restore the building after it was damaged by fire. Instead, he first collected $5,914.05 in fire insurance proceeds for the damage and then arranged for the building's use for fire drills and the testing of new fire equipment by the municipal fire department. As a result, the Margolin building was completely razed by three fire drills in 1968. After the petitioner removed the remaining debris, pushed over the rest of the foundation and chimney and covered the land, he was in possession of valuable land finally cleared of its 40-year old, two-story structure and more marketable than before. The testimony of the municipal fire chief indicated it is only by similar donations of buildings for use in fire drills that the volunteers in this rural area are able to test their new equipment and train new staff members under controlled *35 conditions. Petitioner testified that in the past he had donated similar old buildings to other neighboring municipalities for use by their volunteer fire departments in their training and testing of equipment. Under the provisions of section 170(c) (1) of the Code there is allowed a deduction for a charitable contribution to or for the use of a political subdivision of a State, but only if the contribution or gift is made for exclusively public purposes. Contributions or gifts to a volunteer fire department are deductible under section 170(c) (1) on the ground that the volunteer fire 13 department relieves a political subdivision of the burden of a function normally performed by a municipality. See I.T. 4030, 1950-2 C.B. 23, revoking I.T. 1867, II-2 C.B. 155. See also Roy C. McKenna, 5 T.C. 712 (1945); Isabella M. Sheldon, 6 T.C. 510 (1946). The donated building here was used exclusively for a public purpose. Respondent contends that the arrangement whereby petitioner permitted the Mahwah Volunteer Fire Department to conduct fire drills on the Margolin building does not qualify as a charitable contribution within the intendment *36 of section 170. He argues that when faced with the impending condemnation of the building, the petitioner had no desire to rebuild and therefore donated it with the expectation that its demolition would increase the value of the land and make the property easier to convert to a more productive use. There is no doubt that petitioner's donation of the fire-damaged Margolin building resulted in a clearer tract of valuable land which he could market far more easily than before the demolition. There is also no doubt that petitioner was somewhat motivated in his donation by a desire to have the building burned to the ground by the volunteer fire department. Respondent argues that where the motivation for petitioner's actions does not appear to be from a "detached and disinterested 14 generosity," and where evidence indicates that the primary motive for a contribution is to obtain a direct or indirect benefit by enhancing the value of his remaining property, then a charitable deduction for such a contribution should be denied. Commissioner v. Duberstein, 363 U.S. 278 (1960); Larry G. Sutton, 57 T.C. 239 (1971). Similarly, if a transfer is made with the *37 expectation of receiving something in return as a quid pro quo for the transfer, respondent urges that a charitable deduction should be denied. Singer Company v. United States, 449 F.2d 413 (Ct. Cl. 1971). Respondent correctly states the tests developed by the Duberstein, Sutton and Singer cases in determining whether a claimed charitable deduction will be allowed. This Court has often held that a charitable gift must proceed from affection, respect, admiration, charity or like impulses, rather than from either the incentive of anticipated benefit beyond the satisfaction flowing from the performance of a generous act, or the constraining force of any moral or legal duty. Rainier Companies, Inc., 61 T.C. (1973); Charles O. Grinslade, 59 T.C. 566 (1973); and Harold E. Wolfe, 54 T.C. 1707 (1970). The ascertainment of a donor's subjective intent is frequently difficult to determine. Harold E. Wolfe, supra at 1715. The intent qualifying for a claimed charitable deduction has been found lacking 15 in several situations, namely, where a manufacturer enlarged the future potential market for his product by allowing sizable discounts *38 to a charitable organization, Singer Company v. United States, supra; where a taxpayer dedicated property for a public road in return for favorable zoning, public access and street frontage, Stubbs v. United States, 428 F.2d 885 (C.A. 9, 1970); where land was given to a city under economic duress and threatened legal compulsion, United States v. Transamerica Corporation, 392 F.2d 522 (C.A. 9, 1968); where taxpayers made payments to a hospital in order to obtain the right to practice as staff members thereof, S. M. Howard, 39 T.C. 833 (1963); where parents donated to an educational organization part of the cost of furnishing instruction to their children, Harold DeJong, 36 T.C. 896 (1961), affd. 309 F.2d 373 (C.A. 9, 1962); where a subdivider benefited from the existence of schools and recreational facilities on land he transferred in compliance with county zoning requirements, Jordon Perlmutter, 45 T.C. 311 (1965); where a subsidiary corporation transferred all its equity in bonds to its parent charitable corporation, Crosby Valve & Gage Co., 46 T.C. 641 (1966), affd. 380 F.2d 146 *39 (C.A. 1, 1967), certiorari denied 389 U.S. 976 (1967); where residents transferred their interest in a water and sewer system to their own village, Harold E. Wolfe, supra; where a resident conveyed to a city an easement over a strip of his land for use 16 in widening an adjoining street, thereby enhancing his remaining property, Larry G. Sutton, supra; where petitioners conveyed land in return for substantial cash, other property, dismissal of condemnation suits and a zoning variance, Charles O. Grinslade, supra; and where a company donated a free stadium as an inducement to a city for the purchase of the land thereunder from the taxpayer, Rainier Companies, Inc., supra. In each of the above-cited cases a quid pro quo flowed back to the donor from the exempt organization donee which certainly exceeded the satisfaction which flows from the performance of a generous act. However, as noted by the Court of Claims in the Singer case, there are situations where the benefits of a charitable contribution inuring to the donor are incidental to the much greater benefits inuring to the general public from the donation. When this occurs, *40 the small benefit to the donor does not destroy his right to a charitable contribution deduction. Such incidental, and therefore not disqualifying, benefits which may accrue to a donor within the intendment of section 170(c) (1) have included situations where the donor sought the development and maintenance of a favorable public image in the eyes of the donee organization, Singer Company v. United States, supra at 424; where the donors benefited from a widened street and extended sewer lines, Toole v. Tomlinson, 63-1 U.S.T.C. P 9267 (M.D. Fla. 1963); where the taxpayer 17 wanted to develop its business in a new city and create favorable relations with the community, Citizens & Southern National Bank of S.C. v. United States, 243 F. Supp. 900 (W.D. S.C. 1965); where the removal of railroad traffic through a city benefited merchants and owners of property in the central shopping area, Rev. Rul. 67-446, 1967-2 C.B. 119; and where the provision of public parking for the general public benefited the merchants who contributed toward the facility in the business area of the city, Rev. Rul. 69-90, 1969-1 C.B. 63. In each *41 of these above-cited cases the quid pro quo which flowed back to the donor did not disqualify the claimed charitable contribution deduction. Thus, where the primary benefit inures to the general public with only lesser and incidental benefits flowing back to the donor, then a charitable deduction will be allowed. While we are confronted here with an exceedingly close question, we conclude under these particular circumstances that the benefit flowing back to petitioner, consisting of clearer land, was far less than the greater benefit flowing to the volunteer fire department's training and equipment testing operations. The Margolin building, even after razing, still was not completely cleared from the land. Petitioner needed to remove the debris, demolish the foundation and chimney and cover the land before he could market the property. We think the petitioner benefited only 18 incidentally from the demolition of the building and that the community was primarily benefited in its fire control and prevention operations. Consequently, on balance, we hold that the petitioner is entitled to a charitable contribution deduction. Having reached this conclusion, we must decide the *42 amount of the deduction to which the petitioner is entitled. Respondent contends that the petitioner donated only the use of the building rather than the building itself; and that the petitioner has failed to establish a marketable value for the privilege of using the building for fire drills. Where a charitable contribution is made in property other than money, the allowable deduction is measured by the fair market value of the property at the time of the contribution. Section 1.170-1(c) (1), Income Tax Regs.; John G. Allen, 57 T.C. 12 (1971). Petitioner contends that the fair market value of the Margolin building when donated was $22,585.95. His selected figure is closely related to testimony regarding the reproduction cost for the Margolin building. Respondent claims these costs bear little, if any, relation to the actual fair market value of the building, which was poorly maintained and badly fire-damaged, when donated. We agree. The question as to fair market value is, of course, one of fact. It may be predicated upon expert testimony and more generally on the record as a whole. Estate of Alexia DuPont Ortiz DeBie, 19 56 T.C. 876, 894 (1971); *43 Philip Kaplan, 43 T.C. 663 (1965); Mattie Fair, 27 T.C. 866 (1957); Colonial Fabrics v. Commissioner, 202 F.2d 105 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court. All factors bearing on value are relevant, including the cost, selling price, sales of comparable properties, the present condition of the property, opinion evidence and market conditions. Using our best judgment, based upon careful consideration of all the evidence herein, we conclude, as reflected in our findings of fact, that the fair market value of the Margolin building when donated was $12,835.95. This amount represents the value ($18,750) of the building for insurance loss purposes less the amount ($5,914.05) of insurance proceeds recovered. We need not choose here between the value of the donated use of the building and its fair market value in its damaged condition because in these circumstances we find they are the same. Cf. Estate of Philip A. Carroll, 38 T.C. 868 (1962). Consequently, we hold that the petitioner is entitled to a charitable contribution deduction of $12,835.95. In view of this conclusion, we find it unnecessary to consider *44 the petitioner's alternative contention that he is entitled to either an abandonment or demolition loss equal to the adjusted basis in the building, which we have already determined was zero by the end of 1967. 20 3. Demolition of Building on Leased Property. Finally, we must decide whether the petitioners are entitled to a demolition loss in connection with the Conrad property, which was the subject of a 95-year lease under which the lessee was given the right to demolish any buildings thereon at his own expense. The lessee in fact demolished a 50-year old building prior to the effective date of the lease, January 1, 1970, and the petitioners claimed a demolition loss of $12,020 for the value of the building thus destroyed. Respondent has disallowed this deduction in full on the ground that the lease permitted such demolition and was for a term of years greater than the remaining useful life of the building. Rev. Rul. 67-410, 1967-2 C.B. 93. The evidence shows that in July or August of 1969 the petitioners were approached by the president of Conrad Development Corporation, a company in the construction business, with an inquiry about leasing the Conrad property. *45 Petitioner Morris Scharf was informed then that a bank was interested in leasing the property and that in all probability it would, as tenant, be constructing an office building. He was told that if the negotiations with the bank were successful, he would be contacted by a third party to proceed with the lease arrangements. Subsequently, a lease, effective January 1, 1970, was entered into by petitioners and Conrad Development Corporation on 21 September 23, 1969. Conrad's president testified there was never any intention by the lessee bank to use the buildings already on the leased property and that demolition of the seven old frame buildings was necessary to carry out the planned use of the property, i.e., to construct a branch bank office building. Although demolition was never discussed specifically by Conrad with the petitioners, there is some evidence that an option agreement was entered into between them and Conrad in August 1969 prior to the execution of the lease. This option agreement was conditioned on a bank becoming petitioner's tenant after the erection of a new building by Conrad on the property. It was also evident to petitioner Morris Scharf when he entered *46 into the lease that the lessee would have to construct a more valuable building to sustain its rental commitments under the lease. The existing buildings were clearly unsuitable for the planned use of the property and the rental under the lease was four times greater than that paid by the prior tenants. Furthermore, petitioner Morris Scharf testified that he was aware that the lessee had a planned future use of the property prior to negotiation and execution of the lease and that the lessee would have to "knock down" some or all of the buildings to accomplish this purpose. 22 The crucial question here is whether the lease, or any agreement which resulted in the lease, required the lessee to demolish any buildings on the leased property. Petitioners argue that any unilateral and unexpressed intent of the lessee cannot change the fact that there was no specific requirement in the lease that the building be demolished. Rather, the lease merely permitted the lessee to demolish buildings at its own expense. Without any further express requirement or understanding in writing, the petitioners claim that a demolition loss must be allowed here because the lease does not make demolition *47 mandatory. Petitioners also claim that they were in no way compensated for the demolition of the building, and therefore a loss deduction should be allowed. Section 1.165-3(b) (2), Income Tax Regs., provides that no deduction will be allowed for a demolition loss when a lessee demolishes buildings pursuant to the requirements of a lease or the requirements of an agreement which resulted in a lease. Petitioners urge us to apply the rule of this regulation according to the construction adopted by the Court of Appeals in Feldman v. Wood, 335 F.2d 264 (C.A. 9, 1964), and allow the demolition loss claimed here. The Tax Court has previously distinguished the Feldman case on its facts and has disagreed with its holding to the extent Feldman relief upon the presence of a formal mandatory 23 obligation on the lessee to demolish any buildings. See Herman Landerman, 54 T.C. 1042, 1048 (1970), affd. 454 F.2d 338 (C.A. 7, 1971), certiorari denied 406 U.S. 967 (1972). The test adopted by this Court is whether demolition was sufficiently within the contemplation of the parties at the time the lease arrangements were made that it can be *48 said that the demolition was an essential underlying condition of those arrangements. Herman Landerman, supra at 1047; Donald S. Levinson, 59 T.C. 676, 679 (1973). In Levinson we further elaborated this test by holding that a demolition occurs pursuant to the requirements of a lease when it is a necessary precondition to the fulfillment of the obligations under the lease irrespective of whether it is based on either a unilateral determination or a consensual understanding or undertaking between the lessor and the lessee. Donald S. Levinson, supra at 680. Under the criteria applied by this Court, it is clear that the demolition by Conrad Development Corporation of a building on petitioners' leased property was well within the contemplation of both the petitioners and Conrad during the negotiations prior to the execution of the lease as well as at the time the lease was signed. Morris Scharf knew that demolition of the old buildings on the Conrad property was necessary for the lessee to construct a branch bank thereon that would support rentals four times 24 greater than those received formerly for the same property. The fact that the demolition *49 occurred within 2 months after the execution of the lease, and prior to its effective date, further confirms our finding that the demolition was an underlying condition of the entire lease arrangement. Petitioners' claim that they were not compensated for the demolition of a building on the Conrad property is without support in the record. Respondent points out, and we agree, that petitioners were compensated under the lease arrangement for the demolition of a 50-year old frame building by the following: (1) Increased rentals - nearly four times greater than amounts formerly received for this rental property; (2) payments expended by the lessee for the cost of demolishing the building; and (3) the substitution by the lessee of a far more valuable building on the leased property. Herman Landerman, supra.See also Foltz v. United States, 458 F.2d 600 (C.A. 8, 1972), reversing 322 F. Supp. 414 (W.D. Ark. 1971); Holder v. United States, 444 F.2d 1297 (C.A. 5, 1971); and Liberty Baking Co. v. Heiner, 34 F.2d 513 (W.D. Pa. 1929), affd. 37 F.2d 703 (C.A. 3, 1930). Accordingly, we hold that the petitioners *50 are not entitled to a demolition loss for the building on the Conrad property. To reflect the conclusions reached herein, Decision will be entered under Rule 50.