The CITIZENS & SOUTHERN NATIONAL BANK OF SOUTH CAROLINA, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 4259.

United States District Court
W. D. South Carolina,
Greenville Division.

Heard June 8, 1965.

Decided July 22, 1965.

C. Thomas Wyche, Wyche, Burgess, Freeman & Parham, Greenville, S. C., for plaintiff.

John C. Williams, U. S. Atty., Greenville, S. C., for defendant.

HEMPHILL, District Judge.

In 1959 plaintiff Bank made "contributions" to the South Carolina Highway Department totalling $27,984.50, and itemized and deducted this amount on its tax return, claiming as charitable deductions under the provisions of 26

U.S.C. § 170(c) (1).[1] The composite consisted of 25,200 square feet of land of $19,000 value, 3400 square feet of $7,000 value and a cash payment of $1984.50 to pay for land belonging to a third party which the Highway Department had to condemn in order to build a road.

The deduction(s) were claimed in conjunction with the construction of a road through the Bank's property and were disallowed as charitable contributions by the Commissioner of Internal Revenue on the theory that they were capital expenditures which must be treated as an element of the cost basis of the remaining land. The Bank filed claims for refund which were disallowed. Subsequently, this suit for refund was instituted covering the year 1959.

Plaintiff, after years of effort at acceptance in Greenville, assumed temporary location there in July 1957. At that time, and subsequently, Alester G. Furman Co., a recognized and established realty firm, was offering[2] as "manufacturing or warehouse property" 7.34 acres in Greenville, known as the "Camperdown Mills" tract, bounded on the North by Main and Murphy Streets of Greenville, on the west by Reedy River, on the east by Choice Street and on the south by property of others. Testimony, including exhibits,[3] reveals the property utterly lacking in aesthetic attraction before plaintiff began development. It appears that this general area had become a blighted area frequented by persons of ill repute and a detriment to the growth of Greenville and particularly the south end of town. The buildings were old and not in use, but at the time of purchase by plaintiff in March 1958 it was intended that the then existing mill buildings be used, and, if not feasible or practical, that the main bank building would be constructed on South Main Street and the remainder of the property would be used or developed as a park or for other purposes; no suggestion of or proposal for a road through the property was in evidence or thought of by the taxpayer.

The roadway in question is a United States Highway. It is the main connector route between Church Street (U. S. Highway 29 and Interstate Highway 385 and 185) and South Main Street (U. S. Highway 123). The City of Greenville has two main north-south highways—one, the original Main Street of Greenville and the other a newly constructed expressway parallel to Main Street and on the east known as Church Street. A third expressway on the west side of Main Street, known as Academy Street, is presently under construction. There will be two major new east-west connector streets at either end of the main business district of Greenville joining Main Street with Church Street and Academy Street. These three north-south main arteries together with the two connector east-west, shorter streets, will comprise the business "loop" of the business district of Greenville. The highway in question in this case, hereafter referred to as Camperdown Way, is a major part of the lower east-west connector between Church Street and South Main Street and Academy Street. Camperdown Way, as a U. S. Highway, is an integral part of the United States public highway system, being the direct route joining Interstate Highway 85 with U. S. Highway 123. The testimony shows that since its construction was completed Camperdown Way has become one of the most heavily traveled streets in the City of Greenville and will become

---

1. Which reads as follows:
 "(c) Charitable contribution defined.— For purposes of this section, the term 'charitable contribution' means a contribution or gift to or for the use of—
 "(1) A State, a Territory, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes."

2. Plaintiff's exhibit 6 was a brochure on this property.

3. Plaintiff's exhibits 2 and 3 were pictures of the property before development.

even more so upon completion of the business district "loop."

For many years prior to the construction of Camperdown Way the necessity of an east-west connector from South Main Street in an easterly direction had been recognized by civic leaders and city planners. Greenville is blessed with a natural phenomenon of great beauty in the south end of town, the Reedy River Falls. Reedy River crosses under South Main Street and cascades over a rock precipice some hundred feet in height and then meanders in a generally easterly direction out of the City. One of the programs of the Greenville Chamber of Commerce in 1957–58 was the attainment of an east-west road from South Main Street.

After the purchase a director of plaintiff conceived the idea of running the east-west connector between Church Street and South Main Street through the property. The matter was presented to the President of the Greenville Chamber of Commerce and to the officials of the taxpayer. Plaintiff agreed to give the necessary right-of-way through its property and, as the matter finally resolved itself, provided a short additional right-of-way through two lots of land situate on South Main Street. It was initially believed by the persons involved in the preliminary discussions that the property adjacent to South Main Street would be contributed at no cost to the Highway Department for such connecting road.

In view of the fact that representations had been made to the City and Highway officials on behalf of the taxpayer and by the Chamber of Commerce at the inception of the idea that all property owners could be expected to contribute the right-of-way and that no cost would be involved, taxpayer felt it necessary and honorable to follow through on these initial representations or otherwise the highway presumably would not have been constructed. The Court concludes that the right-of-way through the other properties was made available to the Highway Department by the taxpayer not because it desired the road for enhancement of its property but because the taxpayer felt morally obligated to do so.

The testimony is clear and convincing that the taxpayer, being a new business in Greenville, was desirous of doing everything possible to create favorable relations with the community. The revitalization of the blighted Camperdown area was expected by the taxpayer to be a significant step in public relations. When the possible development of the long discussed east-west connection with South Main Street was brought to the attention of the bank officials they realized the opportunity for making a significant community contribution. The Court is impressed with the fact that when the taxpayer first officially considered the contribution of the land for the new highway and authorized a committee to work out the details the taxpayer at the same time authorized the donating of property to the City for a public park.

The government relied heavily on the minutes of the Board of Directors[4]

4. Significant parts of which read:
February 14, 1958—"The Board was advised that after considerable study of a number of possible locations for a permanent office in the City of Greenville, the Officers of the Bank had concluded to purchase a tract of land, known as the Camperdown tract, which consists of approximately eight acres of land, 4½ acres of which are usable. The cost of this property is $180,000.00. The property, in addition to the land, contains a number of buildings formerly used by the Camperdown Mills. The Officers feel that there are a number of possibilities for the use of the area which will provide, not only sufficient space for adequate banking quarters but which will provide an investment for the Bank. It is felt that some of the buildings will be possibly put to some commercial use which will bring a return on the investment.

of plaintiff to prove taxpayer was motivated for personal or private benefit rather than community good. It is significant that even after the highway was assured, the taxpayer decided, by formal resolution on February 13, 1959,[5] to proceed with the construction of the bank building on South Main Street as originally planned; thus the new highway would have had little effect on the banking operations. It is clear that plaintiff-taxpayer was not motivated by thoughts of private benefit but, to the contrary, was motivated primarily and substantially by benefit to the public. The testimony clearly shows that at the time of the conveyances the benefit to the taxpayer's property was the same in degree and kind as to other property in the vicinity. For reasons not germane to this decision the taxpayer did construct its new bank building facing on the new highway.

■■■■ The provisions of the Code allowing charitable deductions do not prohibit a corporation from deriving some benefit, direct or indirect, from charitable contributions. Indeed, it would seem to be requisite and proper that the corporation have some business purpose or derive some benefit from such contributions in order to justify them from a stockholder standpoint. In an excellent annotation captioned "Corporations' Charitable Gifts," 39 A.L.R.2d 1192, we find, on page 1194:

Where the power is not found either in an enabling statute or in the express provisions of the corporate charter, authority to make charitable contributions must be derived as one implied from the corporation's purpose. Whether or not such a power will be found depends upon such factors as the business of the corporation, the size of the attempted gift, the nature of the charitable institution sought to be benefited, and other relevant factors. *Apparently the underlying thread is whether some*

Upon motion duly made and seconded, the Board authorized the Officers to proceed with the purchase of this property."
March 14, 1958—"President Lane advised the Board that the purchase of the Camperdown Mill Property had been completed and that Title to the property had been taken in the name of a Nominee. He then called on Mr. Wyche to explain to the Board some plans which had been developed concerning the opening of a proposed road through the property. The President then briefly outlined to the Board, the plans which the Bank had for utilizing this property and for making it productive of income to the Bank."
April 11, 1958—"President Lane discussed completely with the Board several proposals for various uses of the Camperdown Mill Property, advising the Board that discussions had been held with the Comptroller of the Currency's Office regarding possible ways of handling the capitalization of this Property. He also discussed with the Board the need for a road through this property which would connect Pendleton Street with either Falls Street or Choice Street in order to divert a portion of the traffic now using Pendleton Street into these other streets and to bring this traffic through the main part of the Property. He advised the Board that discussions were

being carried on on the basis that we would possibly donate a part of this property to the Highway Department for the construction of this road. One of the propositions involved would render a small portion of the property undesirable for business buildings, but highly desirable for a park or recreation area. Upon his recommendation, the Board unanimously authorized Mr. Lane, Mr. Austin, Mr. Mickel, Mr. Bahan and Mr. Wyche to work out the details of the plan most beneficial to the Bank and approved their donating such portions of this property, as they think beneficial to the Bank, to the City of Greenville or the State Highway Department for the construction of this road or for use as a public park."

5. Which reads: "President Lane discussed with the Board the possible location on the Camperdown site of the Bank building which is to be erected for the Greenville Office. Upon motion duly made and seconded, the Board approved the placing of this building on the plot of ground, adjacent to Main Street with a set-back of approximately fifty (50) feet from Main Street which will permit ingress and egress onto the property from the Main Street Bridge; the remainder of the property to be retained by the Bank for future development."

*benefit to the business operations of the corporation can reasonably be expected to accrue as the result of the charitable gift questioned.* [Emphasis supplied.]

This requirement is borne out by the statutory provisions with regard to national banks, 12 U.S.C. § 24, Corporate Powers of Associations:

"* * * [A] national banking association shall * * * have power—

"Eighth. To contribute to community funds, or to charitable, philanthropic, or benevolent instrumentalities conducive to public welfare, such sums as its board of directors may deem expedient and *in the interest of the association* * * *." [Emphasis supplied.]

This Court notes that in one of the cases cited by the government (apparently before charitable contributions by corporations were authorized by the Internal Revenue Code) that a corporate benefit was a prerequisite to claiming a deduction.

Corporations are not entitled to deductions for charitable contributions, but under a Treasury Regulation they are authorized to take deductions for 'donations which legitimately represent a consideration for a benefit flowing directly to the corporation as an incident of its business * * *.' Chicago & N. W. R. Co. v. C. I. R., 114 F.2d 882, 888 (7th Cir. 1940).

There the Court required the existence of some *quid pro quo* which here is claimed to defeat the deduction. Though that case is not controlling, it does emphasize the point that some benefits from charitable contributions do not preclude the deduction.

The benefits derived by the taxpayer from this highway are definitely incidental to the public benefit.

The blighted area previously described has been converted into a commercial area of new office buildings of exceptional beauty. The picturesque Reedy River Falls have been opened to the passing public by a large bridge spanning the gorge immediately below the falls. The south end of Greenville has obviously become revitalized with direct, great benefit inuring to the City and County as a result. It is difficult for the Court to imagine a contribution to a state or municipality of such a modest amount that has resulted in such an extraordinary public benefit.

The government contends that the taxpayer made its contribution as a result of an agreement with the South Carolina Highway Department that it would undertake to build the highway. This argument does a disservice not only to the U. S. Highway itself but also to the South Carolina Highway Department. The Highway Department could not "agree" to construct a highway; the decision to construct a U. S. Highway by the U. S. Bureau of Public Roads or State Highway Department is founded on the public need and not a "swap" of a U. S. Highway for a donated right-of-way. As to the taxpayer, or any contributor, it is apparent that a deed to property for road purposes would not be made except upon the belief and expectation that the conveyance would be used. Nor does the fact that a right-of-way is required to be donated before a highway is built affect the nature of the donation. In South Carolina in many instances, especially as to secondary roads, the right-of-way must be contributed before a project will be undertaken by the Highway Department. This is true of many other charitable contributions; a new Y.M.C.A. or church or university can be built only if the land is donated; the United Fund can only take action if the contributions are made. The fact that the donee requires a donation before it will take action does not invalidate the donation as contended by the government. It has been held that if a *donor* must make a donation before the donor can take action then the donation is for a consideration. For example, in Woodside Mills v. United States, 160 F. Supp. 356 (W.D.S.C.1958) aff'd, 260 F.2d

935 (4th Cir. 1958), one of the basis of disallowing a deduction of a claimed charitable contribution of streets was that the *donor* was required, as a condition to selling its property, to record a plat and thus dedicate its streets. To the same effect, see Rev.Rul. 57–488 cited in the Woodside Mills case, where the taxpayer, in order to obtain approval of a subdivision plan "was automatically required to release to the county certain frontage on each lot to be used to widen the road." It was held that "the land which was required to be released was not a gift but was made as a requirement of law in order to secure the approval by the county planning commission of a plot plan of lots, a prerequisite of the consummation of the sale."

Thus, in these instances, the taxpayer was required to make the conveyances as a condition to the taxpayer's being able to transact its business. In the case at hand the taxpayer had no action to take; it did not have to make a donation as a condition to doing anything.

This case is also to be contrasted with Taynton v. United States, 60–1 U.S.T.C. 9458 (E.D.Va.) and Allis-Chalmers Mfg. Co. v. United States, 200 F.Supp. 91 (E.D.Wis.1961), where there was a property or contractual consideration received by the taxpayer for the "donation" to the charity. Similarly, the reasoning in Commissioner v. Laquna Land & W. Co., 118 F.2d 112, 118 (9th Cir. 1941) does not pass muster as being persuasive here.

There is a recent District Court decision and a Revenue Ruling which are similar on the facts to this case. In Toole v. Tomlinson, Director (S.D.Fla.), C.C.H.T.C., ¶ 9267, the taxpayers had transferred two strips of land to the City of Tampa, one of which was used for a public road as in the instant case, and the other was used for a sewer line right-of-way. "Prior to the trial, the defendant conceded that the north-south strip of land qualified as a charitable contribution * * *" The defendant did not concede that the other conveyance qualified as a charitable contribution.

It was argued in the government's brief that the transfer of these properties was made in anticipation of receipt of economic benefits. The Court ruled that "Although the conveyance involved in this return might have coincidentally benefited the donors, it is the opinion of the Court that the said conveyances qualify as charitable contributions made within the meaning of the Code * * *"

Rev.Rul. 64–205 held deductible a restrictive easement in favor of the Federal Government to enable it to preserve the scenic view afforded certain public properties. The taxpayer gratuitously restricted his parcel of land which presented a scenic view to a nearby Federal Highway; the restrictions pertained to the type and height of buildings, type of activities for which they may be used, size of parcels of land to be sold, etc. It was held that the conveyance of this restrictive easement was a charitable contribution within the meaning of Section 170(c) of the Code.

It is significant that the question of benefit also accruing to the donor was not discussed in this Ruling although it appears obvious that such restrictions would enhance the value of the donor's property in the same way that residential restrictions enhance a residential subdivision. This ruling is consistent with the Court's interpretation of Section 170(c).

## CONCLUSION

 Section 170(c) is not to be construed as applicable only in the event the donor receives no benefit, tangible or intangible, from a contribution. Nor does it seem that motives of a taxpayer in making charitable contributions are relevant if compliance with the statute is otherwise had.

 If these factors are relevant, the Court concludes that the motive of the taxpayer, primarily and substantially, in making the contribution, was for public good and not private benefit and that, while it was in the interest of the taxpayer, from a corporate standpoint, to make the contributions, the

benefits accruing to the taxpayer were only incidental to the public purpose and public benefit.

The contributions were for exclusively public purposes and meet the requirements of Sec. 170(c) of the Internal Revenue Code.

The property conveyed to the South Carolina Highway Department consisted of one parcel of land containing 25,200 square feet (for the new highway) having a fair market value at the time of the conveyance of $19,000.00 and another parcel of land containing 3400 square feet (for widening the intersecting street) having a fair market value at the time of the conveyance of $2600.00 which, together with the cash contribution totaled $27,984.50.

The taxpayer is entitled to a charitable deduction in this amount. The parties have stipulated that appropriate adjustments will be made in the income tax returns of the taxpayer in accordance with this decision. The Court will not, therefore, award a money judgment at this time, but the plaintiff is entitled to refund of taxes, together with interest, based on the deduction herein allowed.

And it is so ordered.