LARRY G. SUTTON AND MARJORIE V. SUTTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4986–69. Filed November 17, 1971.

*Eric L. Burton* and *Alexander D. Thomson*, for the petitioners.
*Norman H. McNeil*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal income taxes for 1966 in the amount of $2,688.72. The sole issue for decision is whether petitioners are entitled to de-

duct, as a charitable contribution under section 170,[1] the value of certain property over which petitioners dedicated a permanent easement to the City of Westminster, Calif., for its use in widening a street.

FINDINGS OF FACT

Larry G. Sutton (hereinafter referred to as Sutton) and Marjorie V. Sutton, husband and wife, were legal residents of Newport Beach, Calif., at the time their petition was filed. They filed a joint Federal income tax return for 1966 with the district director of internal revenue, Los Angeles, Calif.

In 1949, Sutton inherited 9.92 acres of unimproved land located at Golden West Street and Natal Drive in the City of Westminster, Calif. (hereinafter sometimes referred to as City or Westminster). For a period of time prior to and during 1966, Sutton leased the land to a farmer who raised strawberries on it. He received an annual rental of $1,000. During 1966, the land was zoned for industrial use. This zoning limited its use to farming, light manufacturing, and/or manufacturing purposes.

In 1965, the City of Westminster had a master plan for the development of streets in the area of Sutton's property. This plan called for the eventual widening of Golden West Street to a width of 100 feet (50 feet each side of the center of the street). At that time Golden West Street was 60 feet in width (30 feet each side of center). In 1965 and 1966, Westminster did not have funds for the acquisition of land by condemnation along the streets to be widened. The City, however, had adopted an ordinance prescribing standards for the width of streets and for improvements. This ordinance provides that no building may be constructed on land in designated zones if the land is to be used for commercial, industrial, or multiple-residential purposes, unless the abutting street is a prescribed width or the owner dedicates or offers to dedicate a right-of-way sufficient for widening the street to the prescribed width.[2]

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

[2] Municipal Ordinance, sec. 8200.20.C.26, of the City of Westminster provides in part: "No building shall be used, or constructed to be used for any of the commercial, industrial and multiple residential uses permitted in the C1, C2, M1, M2, M3, R2, R3, R4 and R5 zones, nor shall a permit for the construction of such building be issued or a certificate of use and occupancy therefor be issued by the Department of Building and Safety where the land upon which such building is to be used or constructed or where the land to be used for said uses abuts upon any highway or street shown on the official Street and Highway Map of the City of Westminster, adopted by the City Council of the City of Westminister, [sic] on August 17, 1959, and as may be hereafter amended, until and unless the right of way for such street or highway, to the width shown on the official Street and Highway Map, has been dedicated to or vested in the City of Westminster and such right of way including that portion of any existing dedicated street which would normally revert to the abutting

Since Sutton's land abutted Golden West Street and that street did not conform to the requirements of the master plan, Sutton could not have obtained a permit to develop his 9.92 acres of land for most commercial or industrial purposes without dedicating a strip of land to Westminster in accordance with the city ordinance.

During 1966 and for several years prior thereto, Sutton was a member of the City of Westminster Planning Commission. He was familiar with the city ordinance requiring dedication of easements for street-widening purposes. He was also aware that, since the City lacked funds for the condemnation of rights of way, no building permit would be issued for most commercial improvements on his land unless he made a dedication of an easement conforming to the standards prescribed by the master plan.

Sometime in 1966, a representative of the City Engineering Department visited the owners of the property located along the streets designated for widening and requested the owners to dedicate the necessary land to the City. On July 13, 1966, Sutton conveyed, by deed, to the City of Westminster a perpetual easement and right of way for street and highway purposes over a 20-foot strip of his property bordering Golden West Street. The easement comprises approximately 7,313 square feet or 0.1679 acres. The deed permits the City to widen Golden West Street to a width of 50 feet from the center of the street.

Pursuant to its master plan, in 1967 the City of Westminster, exercising its easement rights, widened the east half of Golden West Street adjacent to Sutton's property to a width of 50 feet from the center. As of the date of the trial, the west half had not been widened, and it remains a width of 30 feet from the center line. During the period from 1965 to the date of the trial, Golden West Street had been widened to 100 feet about 1¾ miles south of Sutton's property.

Although Sutton's property was being used solely for farming in 1966, a parcel of land about 1 mile from his property had been sold to an automobile agency during that year. Sutton was aware of this sale; however, he had not listed his property for sale, and was not negotiating for the development of his property or for its lease for commercial, industrial, or multiple-residential purposes at the time of the dedication.

In May 1967, Standard Oil Co., of California contacted Sutton regarding a lease on one corner of the 9.92 acres for use as a site for a retail gasoline station. He and Standard Oil Co. entered into a lease in

property if the street were vacated, has been improved by installation of paving, curbs, gutters and street drainage, in full compliance with 'Standard Streets and Highways Plans,' * * * or the owner has dedicated or irrevocably offered to dedicate such right of way, and prepared plans for the improvement of the street or streets, or highway or highways, and has entered into an agreement with the City of Westminster to make such improvements."

August 1967, and Standard Oil constructed a gasoline station on the site. No improvements could have been installed on the subject property by Sutton or Standard Oil Co. if the easement along the frontage of the property on Golden West Street had not been granted.

In their 1966 Federal income tax return, petitioners claimed a deduction in the amount of $7,300 as a charitable contribution to the City of Westminster. This amount represented Sutton's commercial valuation of the property dedicated to the City. In his notice of deficiency, respondent disallowed the claimed charitable contribution.

OPINION

The issue for decision is whether the value of the easement granted by Sutton to the City of Westminster for street-widening purposes qualifies as a charitable contribution under section 170.[3] Subsection (a) of that section allows a deduction for any "charitable contribution." This includes, under subsection (c), a charitable contribution to a State or a political subdivision thereof, provided the gift is made for "exclusively public purposes." The parties agree that the City of Westminster is an organization of the character referred to in section 170(c), and we have found that the easement rights were to be used for public purposes. The sole issue, therefore, is whether the conveyance of the easement had the characteristics of a "charitable contribution" within the meaning of the section.

The phrase "charitable contribution," as used in section 170, is synonymous with the word "gift." *Harold DeJong,* 36 T.C. 896, 899 (1961), affd. 309 F. 2d 373 (C.A. 9, 1962); *Jordon Perlmutter,* 45 T.C. 311 (1965); *James A. McLaughlin,* 51 T.C. 233, 234 (1968), affirmed per curiam (C.A. 1, 1969, 23 A.F.T.R. 2d 69–1763, 69–2 U.S.T.C. par. 9467); *Harold E. Wolfe,* 54 T.C. 1707, 1713 (1970). A gift is generally defined as a voluntary transfer of property by the owner to another without consideration. *Harold DeJong, supra* at 899. This definition, however, does not refer to consideration in a common-law sense, but rather in a more colloquial sense. Cf. *Commissioner* v. *Duberstein,* 363 U.S. 278, 285 (1960); *Harold E. Wolfe, supra* at 1713. "If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows

---

[3] SEC. 170. CHARITABLE ETC., CONTRIBUTIONS AND GIFTS.

    (a) ALLOWANCE OF DEDUCTION.—

        (1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *
        *      *      *      *      *      *      *

    (c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

        (1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

from the performance of a generous act, it is not a gift." *Harold De-Jong, supra* at 899; *Bogardus* v. *Commissioner*, 302 U.S. 34, 41 (1937).

Determining a taxpayer's incentive, motive, or purpose in making a gift is a factual problem. The inquiry, however, does more than probe the subjective attitude of the donor and the extent to which public-spirited and charitable benevolence prompted the transfer. The inquiry seeks to expose the true nature of the transaction: whether the "gift" was made "in expectation of the receipt of certain specific direct economic benefits within the power of the recipient to bestow directly or indirectly, which otherwise might not be forthcoming." *Stubbs* v. *United States*, 428 F. 2d 885, 887 (C.A. 9, 1970).

These principles have been applied in a variety of factual situations where taxpayers were seeking charitable contribution deductions for transfers of property to political subdivisions. Thus, in *Stubbs* v. *United States, supra*, the taxpayer dedicated a strip of land for use as a public road in order to facilitate his efforts to have his remaining land rezoned for use as a trailer park. In *Jordon Perlmutter, supra*, the taxpayer, in order to obtain approval of his subdivision, conveyed to a city a percentage of the land therein for use by schools and for parks, playgrounds, and other recreational facilities, and his remaining property became more salable. In *United States* v. *Transamerica Corporation*, 392 F. 2d 522 (C.A. 9, 1968), the taxpayer conveyed to a city land which had been used as a thoroughfare near its manufacturing plant on the understanding that the city would improve and maintain it as a public street. In all of these situations the courts found that the primary incentive, motive, or purpose which prompted the transfers of property was to obtain a direct or indirect benefit in the form of enhancement in the value or utility of the taxpayer's remaining land or otherwise to benefit the taxpayer. In none of these cases was the claimed charitable contribution allowed. Only where the anticipated or potential economic benefit, if any, to the taxpayer was not significant, or was only "incidental" to an important public-spirited, altruistic, or charitable benevolence, has the court allowed the claimed charitable contribution. See, e.g., *Citizens & Southern National Bank of S. C.* v. *United States*, 243 F. Supp. 900 (W.D.S.C. 1965).

In the present case, Sutton owned a small tract of land located in an area within the city limits of Westminster where commercial and industrial development was in progress. The only income produced by the valuable tract was a nominal rental of $1,000 per year for use in growing strawberries.[4] The City had adopted a master plan which permitted

---

[4] That this rental of only $1,000 per annum for the 9.92 acres was a meager return in relation to the value of the property is suggested by petitioners' claim of a charitable contribution deduction in the amount of $7,300 for the 20-foot strip—7,313 square feet or 0.1679 acres—transferred to the City; at this value per square foot, the property as a whole had a value in excess of $425,000.

the land to be used for commercial, industrial, and multiple-residential uses. However, under the City's ordinance, a permit could not be obtained for the construction of any buildings on the land unless the abutting streets conformed with specified requirements as to width. Since the street adjoining Sutton's property did not meet these requirements, it could not be developed without widening the streets. After Sutton granted the easement, the street was widened and a city permit for the construction of a building on the land was obtainable.

We do not think the grant of the easement can be regarded as a "charitable contribution." Sutton has shown no public-spirited, altruistic, benevolent, or charitable purpose which he sought to serve through granting the easement. We think the principles of such cases as *Stubbs, Jordon Perlmutter*, and *Transamerica Corporation*, all discussed above, are applicable. Although the facts in some of those cases reveal somewhat stronger evidence of an immediate "trade-off" or *quid pro quo* than those in the present case, we think it clear that Sutton's transfer was made in the expectation of the receipt of specific direct economic benefits in the form of additional utility and value which may be realized through the commercial development of the remainder of the land. Sutton was fully aware that such development was not possible without complying with the city ordinance on street widening. Although he was not compelled to make the transfer, and he testified that he had no immediate plans for the commercial development of his land, the widening of the street had the effect of making his land usable for commercial purposes at any time in the future if he so desires. Cf. *Harold E. Wolfe, supra* at 1715. And the facts are that within less than 5 months after the end of the tax year, he was contacted by Standard Oil Co. for a lease on a corner of the property for a gasoline station site; the lease was negotiated, and a station was built. In light of all this evidence, we are convinced the transfer proceeded from the "incentive of anticipated benefit of an economic nature." *DeJong* v. *Commissioner, supra* at 379.

We are compelled to conclude that Sutton's conveyance to the City of Westminster of an easement over the 20-foot strip of land for use in widening the street adjoining his property was not a charitable contribution within the meaning of section 170.[5]

*Decision will be entered for the respondent.*

---

[5] The portion of Sutton's basis attributable to the strip of land over which the easement was conveyed to the City will, of course, be added to the basis of the remaining land. *Woodside Mills* v. *United States*, 260 F. 2d 935 (C.A. 4, 1958) ; *Jordon Perlmutter*, 45 T.C. 311, 319 (1965) ; Rev. Rul. 57–488, 1957–2 C.B. 157.