JOHN L. CONNELL and KETNA S. CONNELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Connell v. Commissioner
Docket No. 13240-82.
United States Tax Court
T.C. Memo 1986-333; 1986 Tax Ct. Memo LEXIS 274; 51 T.C.M. (CCH) 1657; T.C.M. (RIA) 86333; July 31, 1986. E. Gary Work, Jr., for the petitioners. Francis C. Mucciolo, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: In a notice of deficiency dated March 16, 1982, respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1975
$26,724
1976
5,164
In an amendment to his answer filed with the Court in June 21, 1983, respondent claimed an increased deficiency for 1976 in the amount of $16,167. The issues for decision are: (1) Whether, for purposes of section 170, [1] petitioner John L. Connell made a bargain sale to the State of Florida in 1975 of *275 his one-half interest in 211.341 acres and his one-half interest in an option on 217.659 acres, and, if so, the amount of the bargain. (2) Whether petitioner John L. Connell properly valued his one-half interest in 5.605 acres transferred to the State of Florida in 1975. (3) Whether petitioner John L. Connell made a charitable contribution of his one-half interest in an 11.28 acre right-of-way transferred to Alachua County, Florida, in 1976 and, if so, the amount of the contribution. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. John L. Connell (hereinafter petitioner) resided in Micanopy, Florida, when the petition was filed in this case.Petitioner Ketna S. Connell resided in Gainesville, Florida, at that time. Petitioners filed joint Federal income tax returns for the years 1975 and 1976 with the Internal Revenue Service Center at Chamblee, Georgia. On December 22, 1971, John D. Deen entered into a *276 contract to purchase certain real property and to acquire an option on other real property from Lovette and Dorothy M. Jackson. On the survey plat prepared by M. K. Flowers and Associates, the property contracted for sale to Deen consisted of parcels 1C, 1D, 2, 3, and 133.054 acres north of parcel 2 and the optioned property consisted of parcel 1A and 31.245 acres just south of parcel 1A. This contract was later modified to extend the closing date and to authorize the Jacksons to sell certain of the optioned lands to the City of Gainesville in exchange for granting Deen an option to purchase additional property, including parcel 1B. On April 28, 1973, petitioner and Billy A. Myrick, a long-time business associate of petitioner, entered into an agreement with Deen for an assignment of all of Deen's contract and option rights with the Jacksons for $500,000. Approximately $378,380 of the $500,000 paid to Deen was allocated to the contract rights, with the balance of $121,620 being allocated to the option rights. On July 16, 1973, petitioner and Myrick transferred an option to John G. Powell and Norman L. DeMeza on property known as "The Sweetwater Tract." The Sweetwater Tract included *277 all of the property covered by the contract and option acquired from Deen. Powell and DeMeza paid $10,000 for a 30-day option to purchase the tract. This option covered a total of 550.5 acres and set a closing price of $2,202,000, or $4,000 per acre. Powell and DeMeza purchased the option with the intention of reselling the property to a developer. They allowed the option to lapse, however, because they were unable to locate a developer interested in purchasing the property. On February 15, 1974, petitioner and Myrick closed with the Jacksons on parcels 2 (211.341 acres) and 3 (5.605 acres) and a parcel north of parcel 2 (133.054 acres), a total of 350 acres. The total price paid by petitioner and Myrick for the 350 acres was $1,078,380 or $3,081 per acre, which included the allocable portion of the payment made to Deen. After the closing, petitioner and Myrick continued to hold option rights on parcels 1A, 1B, 1C, and 1D, [2] a total of 217.659 acres. *278 As early was February 1, 1974, petitioner and Myrick were communicating with the State of Florida to determine whether the State was interested in purchasing any of the Jackson property. In early 1974, the State sent Charlie Smith, a purchasing agent, to examine the property. The State's interest in the property stemmed from the fact that it was adjacent to the area known as Payne's Prairie State Preserve and would serve as a buffer between the prairie and development along the edge of Gainesville. At the request of the State of Florida, an appraisal of the properties owned by and under option to petitioner and Myrick was made by Harry B. Broom, Jr., M.A.I. [3] This appraisal was first completed on November 27, 1974, and purported to cover 539.32 acres. Broom valued the property at $2,427.000 or $4,275 per acre. A later survey showed that the land covered by the appraisal actually consisted of 567.659 acres. After receiving this appraisal the State notified Broom that it was only interested in purchasing parcels 1A, 1B, 1C, 1D, and 2, a total of 429 acres. On December 17, 1974, Broom issued a letter valuing the 429 acres by first valuing the 110.32 acres the State did not wish *279 to purchase and subtracting this amount from the original valuation of the entire tract. Broom valued the 429 acres at $2,041,000 or $4,758 per acre. After issuance of this letter, Broom was notified by Alfred F. Tolius, Staff Appraiser for the State of Florida, Department of Natural Resources, that the State wanted the 429 acres valued separately without consideration of the remainder of the tract. On January 20, 1975, Broom issued a second letter valuing the 429 acres separately. In this letter Broom determined the value of the property to be $1,656,000 or $3,860 per acre. The land acquisition was negotiated by the Division of Recreation and Parks of the Florida Department of Natural Resources. The Governor and the State Cabinet, however, had to approve the acquisition. The State did not require petitioner and Myrick to keep the property off the market during the negotiations, which continued for approximately 13 months, but petitioner and Myrick did not attempt to sell the property during this time. In hopes of accelerating the State's land acquisition process petitioner and *280 Myrick hired Randolph Hodges, a former executive of the Department of Natural Resources, to assist in dealing with the State officials. Petitioner and Myrick also hired Harold Haimowitz, an attorney, as a lobbyist to the Florida State Cabinet. Following negotiations with petitioner and Myrick, the Department of Natural Resources recommended a purchase price of $1,501,500 or $3,500 per acre. The Department's recommended purchase price was considered by the Governor and Cabinet during a meeting on March 3, 1975. Petitioner and Myrick were present at this meeting and were able to speak before the State officials in attendance. After discussion of the purchase, the Governor and Cabinet voted to authorize the purchase of the 429 acres for $1,418,000 or $3,305 per acre. Petitioner and Myrick indicated during the meeting that they were willing to sell the property for this price. The appraised value of $1.656,000 and recommended purchase price of $1,501,500 were discussed at length during the meeting but at no time during the meeting did anyone suggest that the difference between either of these amounts and the authorized purchase price of $1,418,000 was to be a gift to the State. *281 On March 17, 1975, petitioner and Myrick transferred their interest in the 429 acres to the State of Florida. Of the 429 acres, 211.341 acres were transferred by warranty deed. Petitioner and Myrick assigned to the State their rights in the other 217.659 acres still under option with the Jacksons. The total consideration paid by the State to petitioner and Myrick for the fee simple transfer and the option was $1,204,538. The State paid $213,462 to the Jacksons to close on the optioned 217.659 acres.The total consideration paid by the State was $1,418,000. [4]
In 1975, petitioner and Myrick also transferred parcel 3 (5.605 acres) to the State. This parcel was transferred to provide road frontage for the 429 acres and, because it was the high point of the property, to provide a view over the prairie. The purchase agreement for the 429 acres did not require petitioner and Myrick to convey the 5.605 *282 acres to the State. Petitioner and Myrick had, however, notified the State of their intention to donate the 5.605 acres prior to the State's purchase of the 429 acres. The 5.605 acres were included in Broom's original appraisal but were not valued separately. Broom's amendments to his appraisal did not include this parcel. On April 22, 1975, Charlie Smith of the Department of Natural Resources sent petitioner and Myrick a letter concerning their transfers of property to the State. The letter thanked petitioner and Myrick for their donation of property to the State. The letter valued the gift at $288,000, based on the difference between an appraised value for the properties of $1,706,000 and a net cost to the State of $1,418,000. The $1,706,000 appraised value stated in the letter was not taken from Broom's appraisal and its source has not been identified. After the sale of the 429 acres and the transfer of the 5.605 acres, petitioner and Myrick retained 133.054 acres of the property acquired from the Jacksons. On October 26, 1976, petitioner filed a zoning application with Alachua County requesting that this property be rezoned from AG (agricultural) to PUD (planned unit development). *283 Prior to applying for the rezoning, petitioner was aware of the fact that the building of a highway across this property was part of the Alachua County thoroughfare plan. The proposed highway was to be part of a loop road around Gainesville. In putting together a plan of proposed development, petitioner and Myrick hired a surveyor, Robert Wigglesworth, to work with themselves and a county engineer, Charles Morgan on placement of a right-of-way for the highway. The county thoroughfare plan allowed for flexibility as to the placement of the right-of-way. Restrictions on the placement of the right-of-way included the location of the intersection of 16th Avenue and State Road 331 and constraints based upon good engineering for the speed and design of the proposed highway. The plan of proposed development was submitted with the application for rezoning and showed the proposed right-of-way. After receiving the rezoning application, the county made a request for a dedication of a right-of-way. Whenever a zoning change was proposed to allow for the subsequent development of property and the development would affect one of the proposed thoroughfares, the county engineer reported to the *284 Board of County Commissioners on the nature of the proposed road passing through the property. As standard procedure, the board would then request that the property owner dedicate a right-of-way to the county. Funding to build the highway through petitioner and Myrick's land was not in the county budget and the county could not require the dedication of a right-of-way as a condition to granting the request for rezoning.If petitioner and Myrick had refused to dedicate the right-of-way the county's only recourse would have been to require that an alignment of the right-of-way be established and that any proposed improvements be set back from the alignment. The county would then have had to purchase or condemn the right-of-way in order to build the proposed thoroughfare. Construction of the thoroughfare, however, was not part of the county's 5-year road building plan. On December 21, 1976, the Board of Alachua CountyCommissioners approved, subject to certain stipulations, petitioner's request to rezone the property. The stipulations upon which approval was conditioned provided that no access be permitted directly from State Road 331 to any of the proposed uses and that approval *285 did not commit Alachua County to construct the proposed 16th Avenue extension through the property. The stipulations did not require petitioner and Myrick to dedicate the right-of-way as a condition to approval of the rezoning. On December 28, 1976, petitioner and Myrick transferred 11.28 acres of the property to Alachua County. On his Federal income tax return for the year 1975 petitioner claimed a charitable contribution deduction for a donation of property to the State of Florida. Petitioner determined the amount of his donation to be $144,000. This amount is one-half of the difference between the value of the property sold to the State as determined by Broom's appraisal and the amount paid by the State, plus $25,000, one-half of the claimed value of the 5.605 acres contributed to the State. On his Federal income tax return for the year 1976 petitioner claimed a charitable contribution deduction for a donation of property to Alachua County. Petitioner determined the amount of the donation to be $67,200, [5] one-half of the alleged value of the 11.28 acres dedicated to the county. *286 OPINION 1. Sale of Interest in 211.341 Acres and Option on 217.659 Acres
The first issue for decision is whether petitioner's sale to the State of Florida of his one-half interest in 211.341 acres and his one-half interest in an option on 217.659 acres included a charitable bargain element, and if so, the amount of the bargain. Section 170 generally provides a deduction for charitable contributions. Section 170(c)(1) provides, inter alia, that a State or a political subdivision thereof is a qualified recipient of such a contribution if the contribution is made for exclusively public purposes. The parties agree that the State of Florida is an organization of the character described in section 170(c)(1) and that the property transferred was to be used for exclusively public purposes. Respondent contends, however, that this transaction was nothing more than an arm's-length sale and that it lacked any bargain element. He asserts that the fair market value of the property did not exceed the amount paid to petitioner and, furthermore, that the character of the negotiations demonstrates that the sale was made without donative intent. Conversely, petitioners contend that *287 Broom's appraisal was accurate and was accepted by the State in arm's-length negotiations as the value of the property. They further contend that the difference between the appraised value determined in Broom's report and the amount the State paid for the property was intended to be a gift to the State. Petitioners argue that they have satisfied the requirements of section 170 and that the amount of the gift is, therefore, a deductible charitable contribution. We agree with respondent that donative intent has not been established with respect to this transaction. "In order for a conveyance to constitute a charitable contribution as a bargain sale the seller must make the conveyance with the requisite charitable intent and the fair market value of the property on the date of the sale must in fact exceed the sales price." Grinslade v. Commissioner,59 T.C. 566, 577 (1973). The burden of proof is on petitioners. Rule 142(a). [6] Petitioners must therefore demonstrate by a preponderance of the evidence (1) that they made the transfer to the State with donative intent, and (2) that the fair market value of the property did in fact exceed the amount paid by the State. *288 In order to show donative intent it must be proven that any excess of the fair market value of the property over the amount paid by the State was surrendered to the State as a gift. Such a transfer is a gift only if it is made primarily for "the satisfaction which flows from the performance of a generous act * * *." DeJong v. Commissioner,36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). Whether donative intent was present in petitioner's transfer depends upon whether his willingness to convey the property to the State for less than its alleged value was primarily motivated by charitable impulses. Because the final purchase price for the property was recommended, discussed and accepted at the meeting of the Governor and Cabinet on March 3, 1975, we look first to the transcript of that meeting to determine petitioner's intention. Mr. Turlington, a member of the Cabinet, initially recommended the purchase price of $1,418,000 for the 429 acres. A lengthy discussion followed Turlington's recommendation, during which both petitioner *289 and Myrick stated that their reason for accepting the price recommended by Turlington was that negotiations had dragged on for 13 months and they wanted to close the deal so that they could get on with their other business. [7] They requested that the Governor and Cabinet act on Turlington's motion and they agreed to accept the price recommended by Turlington. They also requested that the motion not require the transfer of the 5.605 acres because they wished to treat its transfer as a donation for Federal tax purposes. At no time, however, did they attribute their willingness to transfer the 429 acres for less than appraised value to charitable benevolence. Their stated desire to separate the donative transfer of the 5.605 acres from the sale of the 429 acres in combination with their failure to express a donative intent with respect to any portion of the 429 acres strongly suggests that they did not view the sale as including a partial gift to the State. *290 Petitioners assert that the Department of Natural Resources had negotiated for a partial gift of the property prior to the meeting of the Governor and Cabinet on March 3, 1975. The Department of Natural Resources, however, had not negotiated the price of $1,418,000. That price was proposed and accepted at the meeting of the Governor and Cabinet. The price negotiated by the Department was $1,501,500 or $3,500 per acre. At trial petitioner testified that he and Myrick were willing to sell the property for less than the $3,860 per acre appraised value determined by Broom only on the conditions that the State accept the appraised value as the value of the property and that the difference would constitute a charitable contribution. Acceptance of the $3,500 per acre price by petitioner and Myrick, however, was confirmed in a letter from Myrick to Smith dated October 10, 1974, more than 2 months before Broom's first appraisal of the 429 acres. The letter stated: This is to confirm our discussion earlier this week concerning the referenced parcel of land. As we discussed, our price is $3500.00 per acre for the 400 to 450 acre parcel and we will reduce this to $3200.00 per acre *291 should the State desire the entire 568+ acre tract. Again, there is no indication that petitioner and Myrick were contemplating a gift to the State of part of the property. Because this letter was issued prior to Broom's appraisal it contradicts petitioner's statement at trial that he and Myrick were unwilling to accept less than the appraised value determined by Broom unless their conditions were met. There is no evidence in the record that any party had proposed a partial gift prior to October 10, 1974, the date on while petitioner and Myrick confirmed their acceptance of the price of $3,500 per acre for the 429 acres. At trial petitioner testified that Smith was the first to propose a partial gift to the State and that Smith had Broom's appraisal before he made this proposal. Broom's final appraisal of the 429 acres, however, followed petitioner and Myrick's acceptance of the $3,500 per acre price by approximately 3 months. This would seem to be an admission by petitioner that a gift was not being contemplated when the price of $3,500 per acre was accepted. The evidence in this case does not establish that in accepting the price of $3,500 per acre petitioner's motivation *292 was charitable. Likewide, there is no evidence that petitioner and Myrick knew that the price of $3,305 per acre would be proposed at the meeting of the Governor and Cabinet on March 3, 1975. They accepted this price during the meeting without indicating in any way that they were accepting a price below market value with the intention of making a gift to the State. Petitioners nonetheless assert that the letter dated April 22, 1975 from Smith to petitioner and Myrick proves their donative intent. This letter stated: The Department of Natural Resources, Division of Recreation and Parks would like to express its appreciation for the $288,000 donation, including the separate deed for 5.6 acres of road frontage to be used as an entrance station. This property being acquired will be used for limited recreation in Paynes Prairie State Preserve for the use and benefit of all the citizens of Florida and its visitors. Taking into consideration the firm price based on the appraisal of $1,706,000, copy attached, and the net cost to the State of $1,418,000 constitutes a donation of $288,000 and the value of the gift is $288,000. This $288,000 donation represents a very generous gesture *293 on the part of you gentlemen, and we wish to again express our very sincere appreciation for this magnanimous act. The $1,706,000 figure is apparently the sum of Broom's appraised value for the 429 acres and an alleged $50,000 value for the 5.605 acres. We find this letter insufficient to establish that petitioner was motivated by charitable benevolence to accept the final price offered by the State. Alfred Tolius, an appraiser for the Department of Natural Resources in 1974 and 1975, testified that in the latter stages of the transaction "around the time of closing, there was some discussion of a gift." The closing occurred on March 17, 1975. Clearly, any discussion of a gift after October 10, 1974 does not establish that the price of $3,500 per acre was accepted with donative intent unless it is found to reflect discussions prior to such date. Similarly, discussion of a gift after the meeting of the Governor and Cabinet on March 3, 1975, does not establish that the price of $3,305 per acre was accepted with donative intent unless found to reflect discussions during or prior to such meeting. We do not find that Smith's letter reflects the intent of petitioner at the time he *294 accepted the purchase price offered by the State. Petitioner has failed to show that he made the transfer to the State with the requisite donative intent. Assordingly, we hold that petitioners are not entitled to a deduction for a bargain sale to the State of Florida in 1975 of their interest in the 429 acres. 2. Donation of 5.605 Acres to State
We next consider whether petitioner properly valued his one-half interest in 5.605 acres transferred to the State of Florida in 1975. Petitioner contends that the fair market value of the parcel at the time of transfer was $50,000. Respondent contends that the fair market value was not in excess of $35,000. Respondent has not disputed that the fair market value of the parcel is deductible as a charitable contribution. In general, the amount of a charitable contribution made in property other than money is the fair market value of the property at the time of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant *295 facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; McGuire v. Commissioner,44 T.C. 801, 806 (1965). As we have stated previously, however, valuation of property "should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement." Messing v. Commissioner,48 T.C. 502, 512 (1967). To establish a valuation for the 5.605 acres, respondent relies on an appraisal of the parcel prepared by one of his appraisers, Richard Farmer, Jr. Respondent's appraiser used comparable sales to value the property. Among other adjustments made to the prices of the five comparable sales used, Farmer made downward adjustments to the prices of all the comparable sales because of a 150-foot transmission line easement over the 5.605 acres. Farmer also made downward adjustments to the prices because he believed that access from the road was less available to the 5.605 acres than to the comparables. Farmer's report stated that access to the property from State Road 331 was limited because of a concrete wall along the road and because of the steep incline from the road to the property. The parcel has 725 feet of frontage along State *296 Road 331. Petitioners rely solely on the April 22, 1975 letter from Smith to establish their valuation of the 5.605 acres. They object to Farmer's appraisal on numerous grounds. They argue that the transmission easement does not impair development because the easement can accomodate parking and other forms of development which would not interfere with the transmission lines. Petitioners assert that the wall along State Road 331 is not more than 3 feet high and that little engineering skill would be required to grade an entrance into the site at any point along the frontage. Petitioners object to the report's determination that the highest and best use of the property was as investment property rather than as development property. Petitioners also assert that Farmer's report understated the price of one of the 5 comparables by approximately $770 per acre. Respondent concedes that Farmer's report did err by understating the price of one of the comparables by $770 per acre. In addition, we agree with petitioners that the wall between State Road 331 and the property would probably not constitute a significant hindrance to road access. The letter written by Smith, however, is of *297 little use to us in determining the fair market value of the property. The basis for the value set forth in the letter has not been made clear to us. The letter refers to an attached appraisal but petitioners have failed to present to us an appraisal which values the 5.605 acres. We will therefore use $35,000 as the starting point for valuing the property but will increase this amount for the error in pricing the comparable and for the assumption as to limited road access. We deem an appropriate adjustment to be $800 per acre. Rounding the result, we conclude that the fair market value of the 5.605 acres was $40,000 at the time petitioner and Myrick transferred the parcel to the State. 3. Transfer of 11.28 Acre Right-of-Way
The final issue for decision is whether petitioner made a charitable contribution of his one-half interest in an 11.28 acre right-of-way transferred to Alachua County, Florida in 1976, and if so, the amount of his contribution. Respondent contends that petitioner did not intend to make a gift when he transferred the right-of-way to Alachua County because the transfer was made with the expectation of receiving direct economic benefits. Respondent contends *298 that petitioner expected and received favorable zoning of his land and public road access or frontage for some of his property. Respondent also contends that by dedicating the right-of-way petitioner ensured a favorable alignment of the right-of-way. Alternatively, respondent argues that transfer of the right-of-way increased the value of the parent tract and that the difference between the value of the parent tract before the transfer and the value of the remainder after the transfer exceeded the value of the right-of-way.Respondent contends that because the petitioner made a net profit from the transfer he should be denied a charitable contribution deduction. Respondent also asserts that if petitioner is entitled to a charitable contribution deduction, the amount of the deduction does not exceed $50,000. Petitioner contends that any benefits which accrued to him at the time of the dedication of the right-of-way would have accrued whether or not he had made the dedication. Further, petitioner contends that had he not dedicated the right-of-way the county eventually would have had to condemn the property. Petitioner alleges that under Florida law enhancement of the value of the *299 remaining property could not be considered in determining the amount the county would have had to pay for the property in condemnation proceedings and that this condemnation price should be the measure of the gift to the county. Petitioners also allege that the value of the right-of-way was $12,000 per acre. The issues relating to whether a gift of the right-of-way was made by petitioner and whether an increase in the value of the remaining tract should be applied as an off-set to the amount of any gift were first raised by respondent in an amendment to his answer. These issues clearly constitute new matters and respondent bears the burden of proof on these issues. Rule 142(a); Achiro v. Commissioner,77 T.C. 881, 890 (1981). [8] The value of the right-of-way, however, was challenged by respondent in the notice of deficiency. Therefore, petitioner bears the burden of proof as to this issue. Rule 142(a). In dealing with the donative intent of a taxpayer, we stated in Sutton v. Commissioner,57 T.C. 239, 243 (1971), that: Determining a taxpayer's incentive, motive, *300 or purpose in making a gift is a factual problem. The inquiry, however, does more than probe the subjective attitude of the donor and the extent to which public-spirited and charitable benevolence prompted the transfer. The inquiry seeks to expose the true nature of the transaction: whether the "gift" was made "in expectation of the receipt of certain specific direct economic benefits within the power of the recipient to bestow directly or indirectly, which otherwise might not be forthcoming." Stubbs v. United States,428 F.2d 885, 887 (C.A. 9, 1970). For us to find that petitioner's dedication of the right-of-way was not a gift for purposes of section 170, respondent must prove that petitioner made the dedication expecting to receive economic benefits which he might not otherwise receive. Respondent has asserted that petitioner made the dedication in expectation of receiving three such benefits: (1) public road access or frontage for some of his property; (2) favorable zoning of the remainder of his land; and, (3) a favorable alignment of the right-of-way. We note that respondent has offered no evidence which suggests that petitioner's dedication of the right-of-way *301 increased the likelihood of the loop road being built through petitioner's property. The county thoroughfare plan, of which the loop road was a part, merely designated roads which might be needed sometime in the future. The loop road was not included in the county's 5-year road building plan. Also, the loop road was planned as a highway, not as an access road to petitioner's property, and therefore, the development of petitioner's property would not necessarily affect the likelihood of the road being built. For these reasons we do not believe that petitioner dedicated the right-of-way to gain public road access or frontage for some of his property. Respondent has not disputed that under Florida law Alachua County could not have required petitioner to dedicate a right-of-way to the county as a condition to granting the rezoning request. Nor does respondent directly claim that Alachua County officials unlawfully required that petitioner make such a dedication. Respondent does contend that petitioner viewed the dedication as being in exchange for the rezoning. Respondent apparently draws this conclusion from the fact that the zoning application showed a proposed right-of-way which *302 was dedicated 1 week after the rezoning was approved. Without more evidence than respondent has put before us, however, we will not find that county officials would act unlawfully to require the dedication or that petitioner would expect them to so act. Due to respondent's having failed to satisfy his burden of proof, we must assume that petitioner's rezoning request would have been granted without the dedication of the right-of-way and that petitioner would not have expected the dedication to determine whether the rezoning request was approved. Respondent contends that petitioner expected a favorable alignment of the right-of-way in exchange for making the dedication. Robert Wigglesworth, the surveyor hired by petitioner and Myrick to aid in placing the right-of-way, testified at trial that the placement had to satisfy the county's needs and the desire of petitioner and Myrick that the rest of the property not be hindered by the right-of-way. Had petitioner and Myrick not dedicated the right-of-way, the county would have required that an alignment be established and that all development be set back from this alignment. If the alignment sought by petitioner and Myrick upon agreeing *303 to dedicate the right-of-way satisfied the county's needs, we see no basis upon which the county would have rejected this alignment had petitioner and Myrick not chosen to make the dedication. Respondent has failed to offer evidence to the contrary. In the cases cited by respondent, the courts found that each conveyance in question was not a gift because it was made by the donor in expectation of receiving specific direct economic benefits. See Stubbs v. Commissioner,428 F.2d 885 (9th Cir. 1970), cert. denied 400 U.S. 1009 (1971); Pettit v. Commissioner,61 T.C. 634 (1974); Sutton v. Commissioner,supra. Respondent has failed to demonstrate that petitioner made the dedication in expectation of receiving such economic benefits. Accordingly, we hold that petitioner's dedication of the right-of-way did constitute a gift to Alachua County for purposes of section 170. Respondent contends that, if we find that petitioner made a gift, the net amount of the gift should nonetheless be zero. He argues that the value of the parent tract prior to the dedication was $570,000, the value of the remaining property after the *304 dedication was $635,000, and that the value of the dedicated right-of-way was $50,000. Respondent concludes that petitioner received a net benefit of $15,000 ($635,000 - 570,000 - 50,000), and should therefore be denied a charitable deduction. Without considering whether respondent's values are accurate, we think his analysis is wrong in this case. "It is well established that payments to an organization which qualifies as a charity are deductible as a charitable contribution under section 170 only to the extent the amount thereof exceeds the fair market value of any material benefit received in return." Murphy v. Commissioner,54 T.C. 249, 253 (1970). Respondent has the burden of proving that petitioner received a material benefit "in return" for the dedication and the fair market value of such benefit. Rule 142(a).Respondent argues on brief that the increase in the value of petitioner's remaining property resulted from the dedication of the right-of-way. Farmer's appraisal, upon which respondent bases his valuations of the property, however, states that the alleged increase in the value of the remainder tract was considered to have resulted from the "strategic *305 location" of the right-of-way and the "upgrading in the remainder's zoning" from agricultural to planned unit development. We find that any increase in the value of the remainder tract resulted from the setting of the alignment of the right-of-way and the change in zoning, and not from the dedication of the right-of-way. As we have stated above, respondent has not shown that the county would have had reason to require a different alignment of the right-of-way had petitioner not dedicated the right-of-way. Nor has respondent demonstrated that the rezoning application would have been denied had petitioner failed to make the dedication. Thus, on this record, there is no indication that petitioner received a material benefit as a result of making the dedication. Accordingly, we hold that the measure of petitioner's gift to Alachua County is the fair market value of the dedicated right-of-way. [9]
Respondent contends that the value of the dedicated right-of-way was $50,000 or approximately $4,500 per acre. Petitioner contends that the value was $12,000 *306 per acre. Here again, we enter the realm of Solomon-style decision making. Respondent bases his valuation on an appraisal by Farmer. Petitioner has not identified the basis for his valuation but has made numerous objections to respondent's appraisal. Respondent's appraiser valued the 11.28 acre right-of-way by using four comparable sales to estimate the per acre value of the entire 133 acre parent tract. [10] Farmer considered this a reasonable estimate of the per acre value of the 11.28 acres. The appraisal stated that the date of valuation was December 28, 1976, the date of conveyance. While this was a week after approval of the rezoning, Farmer valued the parent tract as if it were zoned AG and the alignment for the right-of-way had not been established. However, as part of this appraisal, Farmer also estimated the value of the remainder tract after the dedication. In this part of the appraisal he valued the property based on PUD zoning and the established alignment for the right-of-way. Farmer estimated a value of $5,500 per acre using the same four comparable sales but making different adjustments to their prices. *307 The four comparable sales used by Farmer consisted of: (1) a sale of property, the price of which was understated by $770 per acre; (2) a listing for nearby propety; (3) the earlier sale of the 429 acres by petitioner and Myrick to the State of Florida; and, (4) a 1978 sale of the remainder tract by petitioner and Myrick for $6,200 per acre. Considering the questionable propriety of using some of these comparables and Farmer's failure to base his valuation upon the facts as they existed on the date of valuation, we think the appraisal is of doubtful worth in determining the value of the right-of-way. Unfortunately, it is the only basis we have been given for valuing the right-of-way. As such, we hold the per acre value of the right-of-way to be the same as the per acre value estimated by Farmer as the value of the remainder tract after the dedication.This estimate was $5,500 per acre, which we round out to a total value of $62,000. Accordingly, we hold that petitioner is entitled to a charitable contribution deduction for the dedication to Alachua County of his one-half interest in the right-of-way based on a fair market value of $62,000 for the right-of-way. Decision will *308 be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The parties stipulated that parcels IC and ID were part of the property which Deen contracted to purchase from the Jacksons. They also stipulated, however, that the disposition by petitioner and Myrick consisted of option rights on parcels IC and ID. We are unable from the record to determine the mechanism by which petitioner and Myrick acquired an option on the two parcels, but we will accept this fact as agreed to by the parties.↩
3. This designation indicates membership in the American Institute of Real Estate Appraisers.↩
4. Petitioner and Myrick had dealt with the State as if they owned the 429 acres in fee simple. In fact, they never exercised the option on the 217.659 acres and, therefore, the closing price on the option was deducted from the price paid to petitioner and Myrick by the State.↩
5. This amount is based on a value of $12,000 per acre for the property and a dedication of 11.2 acres. The actual number of acres dedicated to the county was 11.28.↩
6. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
7. Part of the discussion in response to Turlington's recommendation was as follows: GOVERNOR ASKEW: What is your reaction to the reduced price? I personally would like to asee us buy this, I'm not, I don't feel like that of the area that the Department of Natural Resources is recommending as buffers all around Payne Prairie, I'm not sure that that would be of sufficient priority in consideration of the limitation that, of funds that we have. But, this one area I think probably is the most critical of any possible areas surrounding that. And, my question really becomes one not so much of our desire not to buy it but a desire to try and reconcile the purchase price. MR. CONNELL: Well, Governor, all I would say about that is put yourself in our place who have negotiated all this period of time in good faith. I never saw the state's appraiser before he walked on that piece of property. We didn't dictate which piece of property we would or would not sell. We gave the state the prerogative of determining it themselves. And all that I would ask is that you gentlemen as fair Commissioners and fair to both sides, make that decision. MR. SHEVIN: Sir, about 5.6 acres, would you consider donating that, recognizing that you would a get a substantial federal tax break as a result of such a donation? MR. CONNELL: We, as I said before, Mr. Shevin, we intended to give that to the State of Florida and Alachua County because we want them to have it. Now, like you gentlemen, I was a public servant for some 8 years. I know that the people of Alachua County and the State of Florida can use that piece of property. I wasn't at all sold on going this route when I first got started in this route, it was the idea of keeping the state off my back when I started to developing it. And, so that's not the way it was because you had a genuine interest in it. And, we have gone this route. Now if you really can conscientiously say that after 13 months and we've paid over $100,000 in interest by working with you all, that you should cut it down another $100,000 . . . . MR. O'MALLEY: $155,000. MR. CONNELL: . . . or whatever you're talking about. We've already cut it a $150,000 below your appraisal, then I wouldn't sit here and tell you we wouldn't negotiate. But, I am saying that I think it us only fair that you accept the reports and the appraisals and act upon them and act in our favor under these circumstances. * * * MR. CONNELL: Governor and gentlemen. Mr. Myrick and myself, no question believe, there's no question but what we do believe the matter before you should be acted on affirmatively at the prices that have been quoted. Now, it is also true though that it has cost us over $100,000 in interest alone. And, the long 13 months that we have been acting in good faith, there's no question about that. The point that I'm trying to make is that Mr. Myrick and myself are both businessmen, we have been up here many times to these various hearings. And, before letting this thing drag on and on and on, after talking to Mr. Myrick, we would like to close it out at Mr. Turlington's suggestion and get on with the business at hand. GOVERNOR ASKEW: Well, that's the original motion. We have a substitute to renegotiate. MR. CONNELL: Well, I understand that that's why I'm speaking now to the matter because this is $250,000 below. If it will save us constantly going through this thing and very frankly we both have just, you know, you haven't been on the other side of the position, I guess. But, we'd like to clear the matter up today. We'd like to have Mr. Turlington's motion acted. We do intend, to give the other piece of property. We'd rather not have it tied to the motion, so that it will be for tax purposes. But, we would like to complete it and get on with our business. MR. SHEVIN: I'll withdraw my motion. MR. CONNELL: Thank you. MR. O'MALLEY: I don't know whether or not I want to withdraw my second? GOVERNOR ASKEW: I beg your pardon, Sir? MR. MYRICK: May I say something, Sir? GOVERNOR ASKEW: Yes, Sir. MR. MYRICK: The only thing that I do want to say by my partner, John and I discussing this, was the original price the $1,501,500, at that point was what we told the chief negotiator in the Department of Natural Resources was the least price we would take. We based that on the fact that the land had been under contract well twice in fact, from $4000 to $6000 an acre for sale. And, so at any point, at any rate we stopped at that point. My reason now for accepting Commissioner Turlington's offer here is just as John pointed out there, we feel that we've come this far and we would like to get on with our other business about what we're going to do with the rest of the property. And, we would appreciate if it you would act on that situation.↩
8. See also Seldin v. Commissioner,T.C. Memo. 1969-233↩.
9. Cf. Scheffres v. Commissioner,T.C. Memo. 1969-41; Seldin v. Commissioner,T.C. Memo. 1969-233↩.
10. Farmer's appraisal actually stated that the parent tract consisted of 127 acres. The parties have stipulated, however, that the 133.054 acreage determined by the surveyors M. K. Flowers and Associates was correct.↩